# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> BOSTON SCIENTIFIC CORPORATION, J. RAYMOND ELLIOTT, JAMES R. TOBIN and SAMUEL R. LENO, <br><br> Defendants. | No.  1:10-cv-10593 <br><br> DEMAND FOR JURY TRIAL |

## COMPLAINT

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of purchasers of the common stock of Boston Scientific Corporation ("BSX" or the "Company") during the period from April 20, 2009 to March 12, 2010, inclusive (the "Class Period"), against BSX and certain of BSX's officers and directors for violation of the Securities Exchange Act of 1934 (the "1934 Act").

2.     BSX is a worldwide developer, manufacturer and marketer of medical devices, including products that focus on the treatment of cardiac arrhythmias and heart failure.  Most of BSX's Cardiac Rhythm Management ("CRM") products are implantable cardiac defibrillator

("ICD") systems used to detect and treat abnormally fast heart rhythms (tachycardia).  These include implantable cardiac resynchronization therapy defibrillator ("CRT-D") systems used to treat heart failure, and implantable pacemaker systems used to manage slow or irregular heart rhythms (bradycardia).  BSX's entry into the CRM market resulted primarily from its 2006 acquisition of Guidant Corp. ("Guidant").

3.      ICD systems are far and away the largest contributor to CRM sales, accounting for approximately 70% of that segment's sales in each of the years since Guidant was acquired.  Sales of ICDs and other CRM products were disappointing after the acquisition, leading BSX to record a $2.6 billion goodwill impairment charge during the fourth quarter of 2008.  "At the time of the Guidant acquisition in 2006, we expected average U.S. net sales growth rates in the mid-teens," BSX wrote in its 2008 Report on Form 10-K.  "[W]e now expect average U.S. net sales growth in the mid to high single digits."

4.      Following the acquisition, BSX claimed that its CRM business had stabilized and was poised for growth with the introduction of new products, including the COGNIS and TELIGENT line of ICD devices.  Accepting defendants' claims that BSX had finally turned the corner, Moody's Investors Service, Standard & Poor's Rating Services and Fitch all raised their ratings on BSX securities in early 2009.  In each of its first two quarters of 2009, BSX reported that its domestic CRM business had returned to double-digit growth, reporting 10% growth in 1Q09 and 11% growth in 2Q09.  On the heels of this news, CEO James R. Tobin ("Tobin"), who had engineered (and been roundly criticized for) the Guidant acquisition, announced his retirement.  Tobin was succeeded by BSX Board member J. Raymond Elliott ("Elliott"), the former head of Zimmer Holdings.

5.     When BSX's third quarter results were reported on October 19, 2009, it announced a surprising reversal in the CRM sales trend, reporting a paltry 7% growth in domestic sales, which it attributed to declining demand for its products and disappointing results from newly hired sales staff.  The price of BSX common stock declined 15% on this news, causing a one-day loss of more than $2.4 billion in market capitalization.  In fact, the decline in demand was caused because BSX, under pressure from government regulators, had begun to put a stop to certain illegal and unethical business practices that its sales force had been using to increase CRM sales and reverse the trends that had led to the enormous write-downs at the end of 2008, including the use of impermissible charitable contributions and other financial inducements that violate the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b, the False Claims Act, 31 U.S.C. §3729-3733, or other federal healthcare program requirements.

6.     On November 4, 2009, BSX filed a Report on Form 8-K disclosing without comment that William McConnell Jr., its senior CRM sales and marketing executive, planned to retire at the end of the year.  The 59-year-old McConnell had worked for Guidant at the time of its acquisition by BSX, and before that was a managing partner for Arthur Andersen LLP's consulting arm in Indianapolis, where Guidant was headquartered.  On November 6, 2009, buried in BSX's 3Q09 Report on Form 10-Q, was a brief mention that BSX had received a subpoena from the U.S. Department of Health and Human Services requesting "certain information relating to contributions made by CRM to charities with ties to physicians or their families."

7.     The import of these announcements was not revealed until February 10, 2010, when BSX reported its full year results and lowered its financial guidance, explaining that it expected to **lose up to $100 million in CRM sales** due to the departure of a number of CRM

sales personnel in the wake of "recent disciplinary action" taken against them by the Company. On this news, BSX's common shares fell nearly 10%, wiping out an additional $1.2 billion in market capitalization and returning the share value to its level at the outset of the Class Period. As a Credit Suisse analyst remarked in a report issued after the call: ***"[T]he company gained share in 2009 however it now appears that such share gains may have been helped by questionable sales practices."***

8.      Less than a year removed from the last restructuring of its CRM business, BSX was forced to announce to weary investors that it was again restructuring and had made numerous management changes in another attempt to restore profitability to the business.  Weeks later, an exhibit to BSX's 2009 Report on Form 10-K, filed February 26, 2010, would reveal that many of these changes were required by a Corporate Integrity Agreement BSX had signed with the Office of Inspector General of the U.S. Department of Health and Human Services ("HHS") to prevent the continued use of charitable contributions or other illegal inducements to boost CRM sales.

9.      On the same day its 2009 financial results were released, BSX was attempting to dismiss a negative report in the respected medical journal, *HeartRhythm*, regarding a weakened header bond in one of its COGNIS CRT-D ICD devices that had caused a patient to receive repeated unnecessary shocks to the heart within hours of the device being implanted.[1]  BSX reacted angrily to the report, issuing a press release on February 10, 2010 – the day after the article was published – that accused the journal of rushing to judgment before talking to the

---

[1]      This led to multiple episodes of "inappropriate anti-tachycardia pacing," or ATP.  ATP refers to shocks delivered to the heart that are intended to increase the pace of the heartbeat in an attempt to break a cycle of tachycardia before it can lead to ventricular fibrillation and sudden cardiac death.  ATP is also referred to as "fast pacing" or "overdrive pacing."

Company or receiving a detailed engineering analysis of the device failure – charges later denied by the article's authors.  On the Company's 4Q09 investor conference call held February 11, 2010, Elliot claimed that the incident was caused by a competitor's product, not BSX's device. Nevertheless, BSX acknowledged that it was aware of two other incidents involving a weakened header on the product, had warned doctors of the problem the previous December, and had already "implemented manufacturing process improvements to strengthen the header bond."

10.    On March 15, 2010, investors suffered another blow when BSX unexpectedly announced, before the market opened, that it was suspending all sales of its ICD devices because it had failed to notify regulators of changes in how it manufactures the devices.  The Company said it had stopped shipment of the implants and was recalling all of  its previously shipped inventory.  In a press release issued that day, the Company said that it was aware of at least two instances in which "manufacturing process changes were not submitted for [FDA approval]." The process changes affected virtually all of BSX's ICD product families, including the COGNIS product that was the subject of the *HeartRhythm* article.

11.    On this news, BSX shares dropped an additional 12.6%, to close at $6.80 per share, on volume of 243 million shares, eliminating another $1.5 billion in market value for beleaguered investors.

## JURISDICTION AND VENUE

12.    Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arose under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

13.    Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

14.    BSX's corporate headquarters are located in Natick, Massachusetts, where the day-to-day operations of the Company are directed and managed.

**PARTIES**

15.     Plaintiff City of Roseville Employees' Retirement System purchased BSX common stock as described in the attached certification and was damaged thereby.

16.     Defendant BSX is a worldwide developer, manufacturer and marketer of medical devices based in Natick, Massachusetts.  BSX's common stock is traded on the New York Stock Exchange under the symbol "BSX."  There are approximately 1.5 billion shares of BSX common stock outstanding.  BSX maintains a website at www.bostonscientific.com where it regularly communicates information about the Company to investors.  The website includes an "Investor Relations" link where investors can find information about the Company, including Financial Information, Stock Information, Corporate Governance documents, conference call webcasts, and other information material to investors.

17.     Defendant J. Raymond Elliott ("Elliott") was a member of BSX's Board of Directors throughout the Class Period.  Beginning on July 13, 2009, Elliott became the President and CEO of BSX.

18.     Defendant James R. Tobin ("Tobin") was the President and CEO and a director of BSX until July 13, 2009.  From July 13, 2009 to November 30, 2009, Tobin remained employed as a Senior Advisor to the Company.

19.     Defendant Samuel R. Leno ("Leno") was, at relevant times, Executive Vice President, Financial and Information Systems, and Chief Financial Officer of BSX.

20.     The individuals named as defendants in ¶¶17-19 are referred to herein as the "Individual Defendants."

21.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BSX's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional

investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22.    As alleged herein, each of the defendants acted with scienter in that each defendant knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or omitted to state facts necessary to prevent them from being materially false and misleading under the circumstances.  Each defendant knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the making, issuance or dissemination of such statements or documents as a primary violation of the federal securities laws.  By virtue of their receipt or reckless disregard of information reflecting the true facts regarding BSX, their control over and or receipt and/or modification of BSX's materially misleading statements, and/or their other associations with the Company, each defendant was privy to confidential information concerning BSX and knowingly or recklessly participated in the fraudulent scheme and conduct alleged herein.

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired BSX

common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  BSX has over 1.5 billion shares of stock outstanding, owned by tens or hundreds of thousands of persons.

25.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     Whether the price of BSX common stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

26.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

27.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

## BACKGROUND TO DEFENDANTS' SCHEME

28.     On December 5, 2005, BSX announced it was attempting to acquire Guidant.  On January 8, 2006, it made a definitive offer to do so in a cash and stock transaction valued at $25 billion.  In a press release issued that day, BSX told investors that combined company "sales are expected to grow at a double-digit rate achieving $16 billion in sales in 2011.  Adjusted EPS is expected to be between $1.50 and $1.66 in 2007 and $1.98 and $2.18 in 2008."  The announcement sparked a short and intense bidding war with rival device maker Johnson & Johnson for control of Guidant, causing BSX to increase the value of the offer to $27 billion.  BSX's acquisition of Guidant closed on April 21, 2006.  "'This is a momentous day for the employees and stockholders of the new Boston Scientific,'" Chairman Peter Nicholas crowed in a press release issued that day.

29.     The acquisition did not turn out as planned.  The Company was immediately hit with an FDA warning letter citing serious regulatory problems affecting manufacturing quality systems and record-keeping procedures at three Guidant CRM manufacturing facilities.  Just months after the acquisition was completed, BSX was forced to issue recalls and warnings on almost 50,000 Guidant cardiac devices, leading to a surprise profit warning in September 2006 that sent shares plummeting.  The recalls affected the market's confidence in the quality of Guidant CRM products, reducing demand, and leading to numerous lawsuits that cost the Company millions of dollars in settlements and legal fees.  On October 16, 2006, *Fortune* magazine proclaimed the acquisition "***The (Second) Worst Deal Ever – the biggest M&A***

*blunder since AOL/Time Warner*." By the end of 2006, the price of BSX common stock had

fallen to $17 from a high of $27 when it first revealed its plans to acquire Guidant.

30.     BSX never realized the lofty expectations it set when it announced its bid to

acquire Guidant. Adjusted EPS was just $0.77 for 2007 and $0.81 for 2008. By the end of 2007,

the price of BSX stock had dropped to $11.66 per share. The anticipated double-digit growth

never materialized, as BSX reported net sales of $8.4 billion in 2007, which dropped to $8.1

billion in 2008. At the end of 2008, following the $2.6 billion write-down of goodwill associated

with the Guidant acquisition, BSX's common stock was trading at just $7.74 per share.

31.     As a result of the foregoing events, at the outset of the Class Period, BSX had

suffered enormous harm to its reputation, both among investors and members of the medical

community and their patients. It was therefore critical that the Company restore its reputation by

demonstrating the safety and reliability of its CRM products and its ability to grow revenues

based on legitimate demand for those products. Investors were highly attuned to these

conditions, such that BSX's statements about the safety and reliability of its CRM products, the

sales and demand for those products, and the Company's sales and business practices and ethics

were all highly material to investors.

32.     When BSX reported its 4Q08 and FY08 results on January 28, 2009, it appeared

that the Company had finally turned the corner. The Company's earnings release boasted that it

had achieved its third consecutive quarter of double-digit sales grown in its domestic CRM

business. Despite the announcement of a $2.7 billion write-down of goodwill associated with the

Guidant acquisition that day, defendant Tobin claimed in the earnings release that he remained

bullish on the business:

"This write-down in no way diminishes our confidence in our CRM business," said Tobin. "***CRM is growing, it is taking market share, and it will be a key driver of the Company's sales and earnings growth going forward***."

33.     Tobin echoed this sentiment on a conference call with investors the following day, January 29, 2009:

> As Sam [Leno] detailed, we delivered steady overall growth in Q4 CRM sales, due mainly to strong US defib sales on the heels of our COGNIS and TELIGEN launches. Q4 marked the third consecutive quarter of double-digit sales growth in our US CRM business. We've pulled back into a virtual – pulled into a virtual tie with St. Jude in the US and we expect to continue our comeback based on new product momentum. For the full year, we achieved the highest worldwide defib revenue since 2004, while improving our overall market share position by over 500 basis points. At this time last year, I said that success in CRM in 2008 would depend largely on our ability to leverage our quality improvements, execute on our product launches, and lead with our latitude strategy. ***I'm pleased to be able to say we achieved all of these goals and we begin 2009 with our CRM business in a much stronger position.***

34.     Spurred by these rosy projections, both Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Services ("S&P") raised their ratings on BSX, a significant development for the highly leveraged Company. On March 12, 2009, BSX announced that Moody's had raised the Company's rating outlook to stable from negative, upgraded the Company's U.S. public bond rating to Ba1 from Ba2 and its liquidity rating to SGL-2 from SGL-3, while affirming its corporate credit rating at Ba1, based in part on the Company's "generally steady market share" for CRM products. On March 25, 2009, BSX announced that S&P had raised the Company's rating outlook to positive from negative and affirmed the Company's corporate credit rating at BB+, again based in part on "prospects for (at a minimum) modest growth in cardiac rhythm management devices given recent, new product launches." "We are pleased with the outlook upgrades by both Standard and Poor's and Moody's, which acknowledge the strengthening of our financial fundamentals, the improvements in our businesses, as well as the prospects and the progress we are making in driving profitable sales

growth," Leno was quoted as saying in the March 25, 2009 press release. "We will continue to focus on strengthening our profit margins, free cash flow, debt repayment and financial discipline."

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS AND FRAUDULENT SCHEME AND COURSE OF BUSINESS BY DEFENDANTS DURING THE CLASS PERIOD

35.    On April 20, 2009, BSX issued a press release entitled "Boston Scientific Announces Results for First Quarter Ended March 31, 2009," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.  The release included the following statements:

**First Quarter Highlights (Sales growth rates are constant currency):**

- Achieved sales of $2.010 billion and adjusted EPS of $0.19, both in line with guidance (GAAP loss per share of $0.01)

- ***Increased worldwide sales of cardiac rhythm management (CRM) products nine percent, including a 13 percent increase in implantable cardioverter defibrillator (ICD) sales***

- ***Increased U.S. CRM sales 11 percent, including a 14 percent increase in ICD sales, the fourth consecutive quarter of double-digit U.S. CRM growth***

- Expanded worldwide drug-eluting stent (DES) leadership to 44 percent market share; increased U.S. market share to 50 percent: 27 percent TAXUS®, 23 percent PROMUS®

- Successfully launched the next-generation TAXUS® Liberté® Paclitaxel-Eluting Coronary Stent System in Japan, achieved 54 percent market share

- Increased worldwide Endoscopy sales six percent, Urology/Gynecology seven percent and Neuromodulation nine percent

- Received rating outlook upgrades from Moody's and Standard and Poor's

"***We're off to a good start on the year with four percent sales growth***, excluding divestitures, on a constant currency basis and adjusted EPS at the high end of our guidance range," said Jim Tobin, President and Chief Executive Officer of Boston Scientific.  "***Our CRM and DES results were particularly***

- 12 -

*impressive, with double-digit U.S. growth in both businesses*. We also saw continued solid performances by our Endoscopy, Urology/Gynecology and Neuromodulation businesses. We further reduced risk by settling additional litigation, pre-paying debt, amending our credit facility, and maintaining financial discipline and strong cash flow."

\*     \*     \*

**Guidance for Second Quarter and Full Year 2009**

The Company estimates net sales for the second quarter of 2009 of between $1.960 billion and $2.080 billion, which includes an estimated $100 million negative impact from foreign currency exchange as compared to the second quarter of 2008. Excluding the impact of foreign currency and sales from divested businesses, the Company estimates net sales growth rates of three percent to nine percent during the second quarter of 2009. Adjusted earnings, excluding acquisition-, divestiture-, litigation- and restructuring-related charges; and amortization expense, are estimated to range between $0.16 and $0.21 per share. The Company estimates net income on a GAAP basis of between $0.07 and $0.13 per share.

The Company reaffirms its net sales estimate for the full year of 2009 of between $8.0 billion and $8.5 billion. The Company also continues to expect adjusted earnings, excluding acquisition-, divestiture-, litigation- and restructuring-related charges; discrete tax items, and amortization expense, for the full year of between $0.80 and $0.90 per share. The Company now expects net income on a GAAP basis of between $0.46 and $0.57 per share, as a result of first quarter litigation-related charges and discrete tax items.

"*This guidance reflects our optimism about the growth potential of all our businesses, which are benefiting from our renewed focus on product development and increasing sales profitably*," said Tobin. "Our momentum is building, and we are particularly enthusiastic about our prospects for the second half of the year, which we believe will contribute to a very strong 2009."

36.     On April 21, 2009, BSX conducted a conference call with investors and analysts to discuss the Company's 1Q09 performance and prospects for the remainder of the year. Defendants Tobin and Leno, along with BSX's Vice President for Investor Relations, Larry Neumann, participated in the call. Representatives of 14 investment analyst firms also actively participated in the call and raised questions following defendants' presentations.

37.   At the outset of the call, defendant Leno discussed BSX's 1Q09 performance, telling participants that the "results were highlighted by outstanding performance in our CRM division," noting that the Company "continued to see very good progress" in the CRM business after "the launch of our COGNIS and TELIGEN platforms worldwide, excluding Japan, during the third quarter of 2008, and [was] seeing solid growth in all markets where we have launched these products."   Following Leno's comments, defendant Tobin then made the following statements:

Let me move to the non-financial aspects of the business, starting with CRM, and then share my overall perspective on the quarter. ***First-quarter results for CRM showed continued momentum from our new product introductions, particularly COGNIS and TELIGEN.  As Sam detailed, we delivered steady growth in CRM revenues, due mainly to the strength of our US defib sales, which grew at 14%.  This marks the fourth consecutive quarter of double-digit sales growth in our US CRM business***.  While international defib sales were down slightly year over year, they were up 11% on a constant currency basis. While difficult to confirm until all competitors have reported, we believe that the strong sales growth in both the US and international defib markets will ultimately represent continued defib share gains.

Additionally, we anticipate even stronger international performances when we begin to roll out our latitude patient management system in Europe during Q2. ***Overall, CRM sales for the quarter, both worldwide and in the US were at their highest levels since we purchased Guidant three years ago today.  We have accomplished a great deal in that time.  We've turned CRM into the major growth engine that we envisioned, while significantly diversifying our product mix***.

*         *         *

As I said, today marks the three year anniversary of the Guidant acquisition.  Our two biggest objectives with this purchase were diversion and growth, and we have achieved both.  We now have a much more balanced product portfolio, and ***CRM is expected to be the primary driver of our growth this year. It was not easy getting here.  This is a renewed and revitalized business.  In the process, we kept the best of what Guidant offered: its people, its ability to innovate, and its clinical science, but we completely transformed other areas, like quality, our ability to deliver a pipeline, and our latitude strategy.  2009 will be the first full year we benefit from these significant investments.  This market is still underpenetrated.  I believe we are now the best positioned company to take advantage of the improving dynamics of the CRM market***.

- 14 -

*       *       *

I'm going to close by reiterating a point I made earlier. Today is the third anniversary of our acquisition of Guidant. Seems more like 10. The Q1 numbers are the latest indication that this acquisition is providing us the growth and diversification we've always believed it would. In addition to four consecutive quarters of double-digit CRM growth, we are increasing our lead in the DES market, thanks in part to PROMUS, which also came to us from the Guidant deal. There is something else in the Q1 numbers that bears calling out. CRM had a very good quarter, not only in sales but in profitability.

In addition to all that CRM has accomplished in the past three years, they have also significantly improved their profitability. This has basically filled the hole created by the introduction of PROMUS to our DES mix. CD has done a magnificent job of maintaining total market share, but PROMUS is less profitable than TAXUS. CRM has stepped in and picked up the slack, and in doing so they are making a major contribution. So we're off to a good start in Q1. We have one more quarter of tough comparisons to last year, but then *you're going to see a great Q3 and an even greater Q4. Our momentum is building* and we're optimistic about the growth potential for all our businesses, which are benefiting from our renewed focus on product development and profitable sales growth.

38. On May 19, 2009, BSX issued a press release entitled "Fitch Raises Boston Scientific's Rating Outlook to Positive," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts. The release included the following statements:

Boston Scientific Corporation today announced that Fitch Ratings has raised the Company's rating outlook to positive from stable, while affirming the Company's corporate credit rating at BB+.

Fitch said the revised rating outlook reflects:

- The success the Company has had in stabilizing its drug-eluting stent (DES) business and *returning its cardiac rhythm management (CRM) business to growth, which has included the launch of a number of new DES and CRM products*. Fitch noted that the Company's other businesses have been performing well.

- The Company's restructuring program, which is nearly completed and is expected to provide a lower cost structure going forward.

- The Company's paying down approximately $1.3 billion in debt during the last four quarters.

- 15 -

- The Company's research and development efforts, which are expected to provide a relatively steady stream of new product introductions across Boston Scientific's entire business.

    "***The Fitch upgrade is further testimony to the progress we are making in strengthening our financial fundamentals and driving profitable sales growth***," said Sam Leno, Executive Vice President and Chief Financial Officer of Boston Scientific.   "It comes as additional welcome news after the March upgrades from Moody's and Standard and Poor's. We will continue working to improve our profit margins, free cash flow, debt repayment and financial discipline."

39.     On June 25, 2009, BSX announced the retirement of Tobin and the appointment of Elliott as the Company's new President and CEO.   As a result of his retirement, Tobin received a cash payment of $2.5 million and the Company accelerated the vesting of 2,000,000 non-qualified stock options that had been awarded to him on February 26, 2009, at a strike price of $8.30 subject to a four-year vesting schedule.   BSX common stock was trading at $10 per share on the date of the announcement.

40.     On July 20, 2009, BSX issued a press release entitled "Boston Scientific Announces Results for Second Quarter Ended June 30, 2009," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.   The release included the following statements:

> Boston Scientific Corporation today announced financial results for the second quarter ended June 30, 2009, as well as guidance for net sales and earnings per share (EPS) for the third quarter and full year 2009.

> **Second quarter highlights (Sales growth rates are constant currency):**

- Increased sales seven percent to $2.074 billion and achieved adjusted EPS of $0.20, both at the high end of the Company's guidance range (GAAP EPS of $0.10)

- ***Increased worldwide sales of cardiac rhythm management (CRM) products 10 percent, including a 13 percent increase in implantable cardioverter defibrillator (ICD) sales***

- Increased worldwide sales of drug-eluting stent (DES) systems 14 percent

- Maintained leadership position in worldwide DES market, including a 50 percent share of the U.S. market

- Increased worldwide Neuromodulation sales 18 percent

- Increased worldwide Endoscopy sales six percent, Urology/Gynecology seven percent

"I am excited about joining the Boston Scientific team and to help report a very good quarter," said Ray Elliott, President and Chief Executive Officer of Boston Scientific. "We delivered sales and earnings at the high end of our guidance range with almost all businesses and regions reporting solid results. *The performance of our two largest businesses was particularly impressive*, with Cardiovascular achieving mid-teens growth in DES sales and *CRM recording its fifth consecutive quarter of double-digit growth in the U.S.*"

\*   \*   \*

Worldwide sales of the Company's CRM products for the second quarter – on a reported basis – were as follows:

| (in millions) | U.S. | | International | | Worldwide | |
|---|---|---|---|---|---|---|
| | Q2 2009 | Q2 2008 | Q2 2009 | Q2 2008 | Q2 2009 | Q2 2008 |
| ICD systems | $315 | $276 | $139 | $144 | $454 | $420 |
| Pacemaker systems | 90 | 88 | 65 | 70 | 155 | 158 |
| Total CRM products | $405 | $364 | $204 | $214 | $609 | $578 |

\*   \*   \*

**Guidance for Third Quarter and Full Year 2009**

The Company estimates net sales for the third quarter of 2009 of between $2.0 billion and $2.1 billion. Adjusted earnings, excluding intangible asset impairment charges; acquisition-, divestiture-, litigation- and restructuring-related charges; and amortization expense, are estimated to range between $0.17 and $0.21 per share. The Company estimates net income on a GAAP basis of between $0.08 and $0.13 per share.

*The Company has updated its net sales estimate for the full year of 2009 to between $8.1 billion and $8.4 billion.* The Company expects adjusted earnings, excluding intangible asset impairment charges; acquisition-, divestiture-, litigation- and restructuring-related charges; discrete tax items, and amortization expense, for the full year of between $0.82 and $0.86 per share. The Company expects net income on a GAAP basis of between $0.47 and $0.53 per share.

- 17 -

41.     On July 21, 2009, BSX conducted a conference call with investors and analysts to discuss the Company's 2Q09 performance and prospects for the remainder of the year. Defendants Elliott and Leno, along with Neumann, Executive Vice President for CRM, Fred Colen, Corporate Controller and Chief Accounting Officer, Jeff Capello, and three other senior company executives participated in the call.  Representatives of 13 investment analyst firms also actively participated in the call and raised questions following defendants' presentations.

42.     After Leno told investors that 2Q09 "results were highlighted by outstanding performance across most of our businesses," including "impressive growth in our CRM division," which reported "the fifth consecutive quarter of double-digit year-over-year growth," Elliott made the following statements on the call:

> I want to acknowledge the excellent work done by thousands of CRM employees over the past few years.  ***They have revitalized this business from top to bottom, transforming quality, realigning R&D priorities, and developing a pipeline capable of impressive results.  Our CRM business is in solid shape today thanks to their efforts***.  Second quarter results show continued positive momentum from our recent product introductions, particularly COGNIS and TELIGEN.  As Sam [Leno] said, ***we have delivered steady overall growth in CRM revenues***, due mainly to the strength of our US defib sales, which grew at 14% for the second straight quarter.  This is more importantly the fifth consecutive quarter of double-digit sales growth in our US CRM business.

> We also saw the highest US pacer revenue in four years, supported by the growing adoption of our advanced ALTRUA platform.  International defib sales were up double-digit as well at 10% on a constant currency basis, and we anticipate accelerating international performance in the second half of the year, as we begin to roll out our LATITUDE patient management system in Europe, happening as we speak.

> ***CRM sales this quarter, both worldwide and in the US, were at their highest level since we purchased Guidant.  It's also important to note that our CRM business reported sequential quarterly growth across every major product segment, both worldwide and in the US***.  While de novo implantations in the US market have been flat to down since 2006, replacement [cans] have increased by more than 30% per year.  ***We expect to sustain these positive trends on the strength of our new products, which remain on track to generate an amazing two thirds of CRM sales in 2009.  COGNIS and TELIGEN, the world's smallest and thinnest high energy devices, achieved 100% full field inventory levels***

*during the quarter.  Importantly, up from only 70% in the first quarter.  They continue to be very well received.  Since their recent launch, we believe that we have gained almost 3 share points in the US*.

*        *        *

Let's begin with what we liked about the quarter.   Number one, **solid and diversified sales performance across almost all products and geographic segments.   7% growth despite worldwide recession and strong product competition with the associated price pressure.  I can see no reason at this point in time to alter our 2010 and 2011 aspirations of 5% to 7% constant currency sales growth.  My confidence in no small part is based on what I believe is the finest, and clearly on a per person basis, the most productive salesforces in the business**.  We just need more of them.

43.     On October 19, 2009, BSX issued a press release entitled "Boston Scientific Announces Results for Third Quarter Ended September 30, 2009," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.   The release included the following statements:

**Third quarter highlights (Sales growth rates are constant currency):**

- Increased sales three percent to $2.025 billion and achieved adjusted EPS of $0.19, both within the Company's guidance ranges

- Reported GAAP EPS of $0.13, at the high end of the Company's range

- Maintained leadership position in the worldwide drug-eluting stent (DES) market with a 41 percent share, including a 49 percent share of the U.S. market and a 47 percent share of the Japanese market

- ***Increased worldwide cardiac rhythm management (CRM) product sales eight percent***

- Increased worldwide Endosurgery sales eight percent, including a 10 percent increase in Endoscopy sales

- Increased worldwide Neuromodulation sales 21 percent

- Prepaid $225 million of term loan debt

- Settled 14 outstanding patent litigation matters with Johnson & Johnson

"So far this year, **CRM market growth has not been as strong as expected, but our CRM business has continued to grow,** and we have not seen

the slowdown in hospital stocking described by St. Jude," said Ray Elliott, President and Chief Executive Officer of Boston Scientific.

*      *      *

Worldwide CRM sales for the third quarter – on a reported basis – were as follows:

| (in millions) | U.S. | | International | | Worldwide | |
|---|---|---|---|---|---|---|
| | Q3 2009 | Q3 2008 | Q3 2009 | Q3 2008 | Q3 2009 | Q3 2008 |
| ICD systems | $314 | $291 | $131 | $132 | $445 | $423 |
| Pacemaker systems | 90 | 86 | 73 | 63 | 163 | 149 |
| | ------- | ------ | ------ | ------ | ------ | ------ |
| | 404 | 377 | 204 | 195 | 608 | 572 |
| Electrophysiology | 30 | 30 | 8 | 10 | 38 | 40 |
| | ------ | ------ | ------ | ------ | ------ | ------ |
| Total CRM | $434 | $407 | $212 | $205 | $646 | $612 |
| | === | === | === | === | === | === |

*      *      *

## Guidance for Fourth Quarter and Full Year 2009

The Company estimates net sales for the fourth quarter of 2009 of between $2.025 billion and $2.125 billion. Adjusted earnings – excluding acquisition-related credits, restructuring and restructuring-related costs, and amortization expense – are estimated to range between $0.17 and $0.21 per share. The Company estimates net income on a GAAP basis of between $0.20 and $0.25 per share.

The Company has updated its net sales estimate for the full year of 2009 to between $8.134 billion and $8.234 billion. The Company now expects adjusted earnings for the full year – excluding intangible asset impairment charges; acquisition-, divestiture-, and litigation-related net charges; restructuring and restructuring-related costs; discrete tax items; and amortization expense – of between $0.75 and $0.79 per share. The Company expects net income on a GAAP basis of between $0.43 and $0.48 per share.

44.    On October 20, 2009, BSX conducted a conference call with investors and analysts to discuss the Company's 2Q09 performance and prospects for the remainder of the year. Defendants Elliott and Leno, along with Neumann, Colen, and three other senior company executives, participated in the call. Representatives of 14 investment analyst firms also actively participated in the call and raised questions following defendants' presentations.

- 20 -

45.     On the call, both Elliott and Leno blamed the Company's disappointing performance on macroeconomic issues and a slowdown in overall demand for CRM devices. Despite this, defendants claimed to be pleased with the Company's CRM performance. "We continued to see solid growth in our CRM business in the quarter although our growth is slower than anticipated," said Leno. "We delivered steady overall constant currency CRM product growth of 8% in third quarter revenues with US defib sales up 8% driven by our COGNIS intelligent products," added Elliott. "This marks nine straight quarters of CRM growth both US and worldwide."

46.     Rather than admitting that the Company's sales force had been inflating demand through the use of improper inducements to health care professionals and was under investigation for doing so, Leno claimed that the reduced sales in the quarter resulted from lower sales by newly hired sales staff:

> Now let's turn to guidance.  [As] we began 2009, we expected our sales and earnings in the last half of 2009 would be substantially higher than the first half.  We performed well throughout the first six months of this year but *the following issues, some of which began to show up in our third quarter, will cause us to fall short of the original expectations in the last half of this year.*  Beginning in the last half of 2008 and throughout 2009, *we planned to add many CRM reps, that we expected would drive significant incremental revenue in the back part of this year.  We have indeed added these reps in the US, Europe, and Japan, and most have completed training, but they're effectiveness in the field will take longer than we had originally envisioned*.

47.     On December 10, 2009, BSX announced the pricing of a public offering of $2 billion aggregate principal amount of its senior notes under the Company's shelf registration statement.  The offering closed on December 14, 2009, and consisted of $850 million of 4.50% notes due January 2015, $850 million of 6.00% notes due January 2020 and $300 million of 7.375% notes due January 2040.

48.     On December 23, 2009, BSX issued a press release entitled "Boston Scientific Announces Settlement of DOJ Investigation Relating to Post-Market Surveys Conducted by Guidant," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.  The release included the following statements:

> Boston Scientific Corporation today announced that it has entered into a civil settlement with the U.S. Department of Justice regarding the Department's investigation relating to certain post-market surveys conducted by Guidant Corporation before Boston Scientific acquired Guidant in 2006.  Boston Scientific had previously disclosed the investigation, which was conducted by the United States Attorney's office in Boston.

> This civil settlement brings to a conclusion an investigation that began in 2005 and involves no admission of wrong doing by the Company.  Under the terms of the settlement, the Company has agreed to pay $22 million, which was previously fully accrued.

> ***The Company also agreed to enter into a Corporate Integrity Agreement (CIA) with the Office of Inspector General for the U.S. Department of Health and Human Services.  The CIA requires enhancements to certain compliance procedures related to financial arrangements with health care providers.  It is limited to the Company's cardiac rhythm management business, which became part of Boston Scientific through the Guidant acquisition***.

49.     On February 10, 2010, BSX issued a press release entitled "Boston Scientific Announces Results for Fourth Quarter and Year Ended December 31, 2009," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.  The release included the following statements:

> Boston Scientific Corporation today announced financial results for the fourth quarter and full year ended December 31, 2009, as well as guidance for net sales and earnings per share (EPS) for the first quarter and full year 2010.

> **Fourth quarter highlights (sales growth rates are at constant currency):**

> •     Recorded net sales of $2.079 billion, at the mid-point of the Company's guidance range, and achieved adjusted EPS of $0.20, at the high end of the Company's guidance range, reporting a GAAP loss of $0.71 per share

- Maintained leadership position in the worldwide drug-eluting stent (DES) market with a 39 percent share, including a 46 percent share in the U.S. and a 44 percent share in Japan

- Increased worldwide Endoscopy sales 10 percent for the quarter, and reached the $1 billion milestone in 2009 worldwide sales

- Increased worldwide Urology/Gynecology sales eight percent, including 23 percent growth in our Women's Health business

- Increased worldwide Neuromodulation sales 18 percent

- Generated 44 percent of sales from new products

- Received CE Mark approval and launched the internally developed and manufactured PROMUS® Element™ Everolimus-Eluting Coronary Stent System in Europe

- Launched the COGNIS® cardiac resynchronization therapy defibrillator (CRT-D) and TELIGEN® implantable cardiac defibrillator (ICD) systems in Japan

- Issued $2.0 billion of senior notes and prepaid remaining term loan debt maturities

- Received ratings upgrade to investment grade (BBB-) from Standard & Poor's

- Resolved longstanding litigation with settlement of $1.725 billion

"We delivered a quarter in line with expectations, coming in at the middle of our sales range and the high end of our adjusted earnings range," said Ray Elliott, President and Chief Executive Officer of Boston Scientific. "Endoscopy, Urology/Gynecology and Neuromodulation posted excellent growth, and we maintained our clear leadership in the global drug-eluting stent market.   In Japan, we have launched COGNIS, TELIGEN and our PROMUS® Everolimus-Eluting Coronary Stent System, three important new products in this key market. COGNIS and TELIGEN, the smallest and thinnest high-energy devices, are now available worldwide."

"The litigation settlement announced last week with Johnson & Johnson is part of our ongoing effort across the Company to reduce risk," said Elliott."  We have the financial strength and flexibility to meet this obligation with no appreciable impact on our debt covenants and still retain significant liquidity."

**<u>Fourth Quarter 2009</u>**

Net sales for the fourth quarter of 2009 were $2.079 billion, as compared to net sales of $2.002 billion for the fourth quarter of 2008.  Excluding the impact of foreign currency and net sales from divested businesses, net sales were flat with the prior period.

Worldwide Cardiac Rhythm Management (CRM) group net sales for the fourth quarter on a reported basis were as follows:

| (in millions) | U.S. | | International | | Worldwide | |
| --- | --- | --- | --- | --- | --- | --- |
| | Q4 2009 | Q4 2008 | Q4 2009 | Q4 2008 | Q4 2009 | Q4 2008 |
| ICD systems | $307 | $299 | $142 | $128 | $449 | $427 |
| Pacemaker systems | 82 | 84 | 76 | 60 | 158 | 144 |
| | 389 | 383 | 218 | 188 | 607 | 571 |
| Electrophysiology | 29 | 29 | 9 | 8 | 38 | 37 |
| Total CRM group | $418 | $412 | $227 | $196 | $645 | $608 |

\*       \*       \*

**<u>Full Year 2009</u>**

Net sales for the full year 2009 were $8.188 billion, as compared to net sales of $8.050 billion for the full year 2008, which included sales from divested businesses of $69 million.  Excluding the impact of foreign currency and net sales from divested businesses, net sales increased four percent over the prior period.

Worldwide CRM group sales for the full year – on a reported basis – were as follows:

| (in millions) | U.S. | | International | | Worldwide | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2009 | 2008 | 2009 | 2008 | 2009 | 2008 |
| ICD systems | $1,248 | $1,140 | $544 | $541 | $1,792 | $1,681 |
| Pacemaker systems | 346 | 340 | 275 | 265 | 621 | 605 |
| | 1,594 | 1,480 | 819 | 806 | 2,413 | 2,286 |
| Electrophysiology | 116 | 116 | 33 | 37 | 149 | 153 |
| Total CRM group | $1,710 | $1,596 | $852 | $843 | $2,562 | $2,439 |

50.     Also on February 10, 2010, BSX issued a press release entitled "Boston Scientific Rebuts HeartRhythm Article," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.  The release included the following statements regarding newly reported defects in the Company's COGNIS CRT-D system, which was delivering

inappropriate shocks to patients who had the device planted subpectorally (under the pectoral muscle), leading to multiple episodes of anti-tachycardia (fast heartbeats induced to break a cycle of tachycardia before it becomes life-threatening):

> We find it unacceptable that HeartRhythm rushed this manuscript to publication and speculated on the cause of the problem without requesting from us a detailed engineering analysis of the explanted device.  Our analysis found that while the bond between the header and the case was weakened, the device functioned normally and a weakened header bond was not the cause of the abnormal sensing and pacing impedance observed in this patient.

> X-ray analysis and electrical testing verified that the header wires were neither fractured nor otherwise damaged, and the seal between the header and the case was secure with no evidence of body fluid under the header.  In short, there is no mechanism to link the noise observations to a weakened header bond.

> Noise observations during the initial implant were not header-related.  In fact, the authors themselves stated: 'It is possible that the initial noise observed on the RV pace/sense channel was due to an RV lead abnormality and not to the header abnormality.'   None of the leads implanted in the patient were manufactured by Boston Scientific.

> Including this most recent case, only three instances of weakened header bonds have been observed in a context of more than 90,000 COGNIS and TELIGEN devices implanted subcutaneously.  The overall rate of events for this device family compares very favorably to the performance of similar devices and is well within accepted performance ranges.

51.    In a February 11, 2010 conference call with investors, Elliott continued to criticize the medical journal for reporting on the defect, even while admitting that the Company needed to fix it:

> Heart Rhythm was completely out of line to publish this article prematurely, without even requesting our engineering analysis of the explanted device.  We conducted our own analysis that became abundantly clear that our device worked normally and that the weakened header bond was not the problem.  We believe the problem was caused by a competitors' lead, not our device.  Even if you count this case, we've seen only three cases of potential problems with header bond in subcutaneous implant out of more than 90,000 cases.  Those numbers are well within accepted norms.  *We've improved the bond and we're getting these devices out to customers, allowing for either subpectoral or subcutaneous implantation.  This transition should be completed next month*.

52.   In the February 10, 2010 press release, the Company similarly reassured investors by claiming that it had already obtained regulatory approval for and implemented manufacturing process changes to fix the header problems:

> *We have implemented manufacturing process improvements to strengthen the header bond on these devices, allowing physicians to implant devices in either a subpectoral or subcutaneous position.  We have received approval from U.S. and European regulatory authorities for the devices with the strengthened header bond and have been shipping these devices*.  We expect to complete the transition to these devices by next month.

53.   On February 12, 2010, the authors of the *HeartRhythm* article responded to the Company's rebuttal of their report, denying in an article published on heart*wire* (www.theheart.org) that the article was published before the journal had BSX's analysis:

> [Beth Israel Deaconess Medical Center Dr. William H.] Maisel and [Winthrop-University Hospital Dr. Joseph J.] Germano said they did indeed receive a copy of the company's analysis before submitting the case report to the journal.  In fact, some of the report details were included in their paper, they say.
>
> "Quite frankly I'm a little bit at a loss to explain Boston Scientific's reaction," Maisel told heart*wire*.  "We're a little bit confused by their statement that the journal published it before we'd received the manufacturing analysis, because *we had a letter from them with the analysis, dated prior to the acceptance date of the manuscript*."

54.   According to the study authors, there was no question that the BSX product had failed.  In fact, heart*wire* reported that BSX had long known about the header problems, and even issued an advisory to physicians on December 1, 2009, warning them against implanting the device under the pectoral muscle of heart patients:

> As Germano explained to heart*wire*, when device interrogation detected the inappropriate therapies, he and his colleagues first suspected the lead, which they replaced.  *But when the events continued, they opted to replace the generator itself.  That's when they noticed that the header – the structure that connects the leads to the main device – was partially detached from the device itself.  "It was impressive,"* Germano said.  *"This wasn't a subtle finding*."

**Header problem already acknowledged**

- 26 -

*Boston Scientific, in fact, was already aware of what it described as a rare, weakened header-bond problem with two brands of devices – the COGNIS CRT-D and the TELIGEN ICD.  The company had sent a "Dear Doctor" letter in December 2009, warning physicians that mechanical stress associated with subpectoral implantation may weaken the bond between the header and the titanium case of the device itself*.  In this December announcement, Boston Scientific said it was aware of two subpectoral cases, worldwide, of weakened header bonds.  The December alert also estimated that just 5% of the 77,000 Cognis and Teligen devices implanted worldwide would have been implanted in the subpectoral location.

55.     The foregoing statements issued by defendants to investors during the Class Period were materially false and misleading because they misrepresented existing facts known to defendants or recklessly disregarded by them, or omitted to disclose facts defendants knew or disregarded that were necessary to make the statements made not misleading to investors, including the following:

(a)     The statements about CRM sales, demand, market share and growth, and the strength and success of BSX's CRM sales force, were all materially misleading in that they failed to disclose the extent to which sales and demand had been artificially inflated by the payment of illegal and improper inducements to health care professionals.

(b)     The statements about CRM sales and demand were also materially misleading in that they failed to disclose the extent to which the reported or anticipated revenues resulted from the sale of products which had been manufactured without required FDA approval, such that they were subject to recall and refund or replacement.

(c)     The financial guidance provided in BSX's earnings releases and on investor conference calls was misleading in that it omitted to disclose the extent to which the sales estimates had been inflated by sales expected to be achieved through the payment of illegal and improper inducements.

(d)     The statements about weaker than expected growth in the CRM market in 3Q09 were misleading because they failed to disclose the extent to which demand had weakened due to the curtailment and cessation of payments of illegal and improper inducements to health care professionals and by attributing weakened demand to other factors.

(e)     The statements about CRM sales in general and sales of COGNIS and TELIGEN ICDs in particular were materially misleading because defendants failed to timely or fully disclose the problems and defects in the headers of the devices.

(f)     The disclosure on December 23, 2009 regarding the Corporate Integrity Agreement was misleading because it implied that the agreement was related entirely to the pre-acquisition investigation of and misconduct by Guidant, and failed to disclose that the agreement resulted from or was otherwise related to an investigation into similar ***post***-acquisition and ***on-going*** business activities that threatened BSX's current and future revenues and business reputation.

## THE CONDITIONS CONCEALED BY DEFENDANTS' FRAUDULENT SCHEME ARE GRADUALLY REVEALED, CAUSING DAMAGES TO CLASS MEMBERS

56.     The market for BSX common stock was open, well-developed and efficient at all relevant times.  Plaintiff and other members of the Class purchased or otherwise acquired BSX common stock in reliance upon the integrity of the market price of BSX common stock and market information relating to BSX.  As a result of their purchases of BSX stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

57.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of BSX's common stock and operated as a fraud or deceit on Class Period purchasers of BSX common stock by

misrepresenting the Company's business practices, the amount and source of its revenues, the reliability of its products, its compliance with legal and regulatory requirements, the risks to its present and future operations, and BSX's past performance and prospects for future success. The false and misleading statements and omissions described above caused BSX's common stock to trade at artificially inflated prices during the Class Period. When defendants' prior misrepresentations and fraudulent conduct, or the economic consequences thereof, were disclosed and became apparent to the market, the price of BSX common stock declined disproportionately to the market and relevant peer indices, thereby eliminating the prior artificial inflation. The inflation was not eliminated all at once, but was removed through a series of partial public disclosures of the facts and conditions concealed by defendants' fraudulent scheme, causing the price of BSX common stock to decline, thereby injuring Class members who purchased BSX stock at the artificially inflated prices prevailing in the market during the Class Period.

58.     Some of the inflation was eliminated as a result of BSX's 3Q09 earnings release issued on October 19, 2009, which revealed declining sales of and demand for BSX's CRM products, causing the price of BSX's common stock to decline 15.6% in a single day, falling from $10.16 to close at $8.57, and causing economic injury to plaintiff and other members of the Class. BSX's public disclosures shortly after this announcement demonstrate that a significant reason for the decline in demand was that BSX had suddenly reversed its practice of making charitable contributions and providing other improper benefits to health care providers to induce them to purchase BSX products. On November 6, 2009, BSX issued its Report on Form 10-Q for 3Q09, which disclosed that "[o]n September 25, 2009, we received a subpoena from the U.S. Department of Health and Human Services, Office of Inspector General, requesting certain

information relating to contributions made by CRM to charities with ties to physicians or their

families."  Just one day earlier, BSX filed a Report on Form 8-K with the SEC disclosing that

"William F. McConnell, Jr., the Company's Senior Vice President for Sales, Marketing and

Business Strategies, CRM and one of our named executive officers, informed his management

team of his decision to retire from the Company as of December 31, 2009."  On December 23,

2009, the Company entered into a Corporate Integrity Agreement with HHS agreeing to strict

new disclosure and audit requirements designed to prevent BSX from further violations of the

Anti-Kickback Statute and other requirements of federal law governing charitable contributions

and other payments to health care professionals by medical equipment manufacturers.

59.     The inflation was not completely eliminated by this decline, because the October

19, 2009 announcement did not reveal BSX's crackdown on illegal charitable contributions and

the other misconduct that had been used to artificially boost CRM sales and demand, nor did it

reveal the extent to which CRM sales had declined due to the cessation of this misconduct or due

to concerns over the faulty header on some of its CRT-D products.   Hence, while the

announcement revealed the economic impact of these fraudulently concealed conditions,

partially correcting the market price for BSX stock, it did not reveal their root cause, thereby

maintaining some of the artificial inflation in the price, and continuing to mislead investors about

BSX's business practices and the continued risks to its revenues and business reputation.

60.     Additional inflation was eliminated following the events of February 10, 2010,

when BSX revealed: (i) continued sales declines in CRM products and reduced expectations

going forward because a number of sales people had been fired or quit after being disciplined for

using illegal charitable contributions to illegally boost CRM sales; (ii) sweeping management

and organizational changes and a major business restructuring designed to improve operational

results and increase accountability, much of which was required by HHS as a result of its investigation into the illegal charitable contributions by CRM sales people; and (iii) concerns over the safety and reliability of some of its ICD systems.  On this news, the price of BSX's common stock declined by nearly 10%, falling from $8.29 on February 10, 2010 to close at $7.47 on February 11, 2010, causing additional economic harm to plaintiff and other members of the Class.

61.     BSX's 4Q09 earnings release on February 10, 2010 included the following statements revealing the impact of the foregoing conditions:

**Guidance for First Quarter and Full Year 2010**

The Company estimates net sales for the first quarter of 2010 of between $2.000 billion and $2.100 billion.  Adjusted earnings, excluding acquisition-related credits, restructuring and restructuring-related costs, and amortization expense, are estimated to range between $0.13 and $0.17 per share.  The Company estimates net income on a GAAP basis of between $0.14 and $0.20 per share.

The Company estimates net sales for the full year 2010 of between $8.100 billion and $8.500 billion.  Adjusted earnings, excluding acquisition-related credits, restructuring and restructuring-related costs, and amortization expense, are estimated to range between $0.62 and $0.72 per share.  The Company estimates net income on a GAAP basis of between $0.37 and $0.49 per share.

62.     Also on February 10, 2010, BSX issued a press release entitled "Boston Scientific Announces Management Changes and Restructuring Initiatives," which revealed the management changes and business reorganization required as a result of the housecleaning in the CRM business.  That release stated, in part:

Boston Scientific Corporation today announced a series of management changes and restructuring initiatives designed to strengthen the Company and position it for long-term success.

"The actions we are announcing today will provide the organizational structure and leadership needed to execute our strategic plan and fulfill the enormous promise of this company," said Ray Elliott, President and Chief Executive Officer of Boston Scientific.  "They are aimed at driving innovation,

accelerating profitable growth *and increasing* both **accountability** and shareholder value. Above all else, they will help us better serve our customers and their patients."

Key components of the management changes and restructuring initiatives include:

- The Cardiovascular Group and Cardiac Rhythm Management Group (formerly Guidant) will be combined into one, stronger and more competitive organization that will deliver better value to hospitals, better solutions to physicians and better outcomes to patients. ***This combined organization will also position the Company to respond more efficiently and effectively to rapidly accelerating changes in the procurement, reimbursement and regulatory environments, and to other changes in the delivery of health care globally***. The new organization will be led by Hank Kucheman, who has been promoted to Executive Vice President and President of the new Cardiology, Rhythm and Vascular Group. Mr. Kucheman most recently served as President of the Cardiovascular Group. The Group will increase its focus on structural heart, disruptive, primary prevention ICDs, atrial fibrillation and hypertension. The Endovascular Unit, including Peripheral Solutions, Neurovascular, Imaging, Electrophysiology and the Canadian business unit, will report to new Senior Vice President and Executive Committee member, Joe Fitzgerald.

- Fred Colen has been promoted to the new role of Executive Vice President and Chief Technology Officer (CTO). As CTO, Mr. Colen will oversee a centralized corporate research and development group that will refocus and strengthen the Company's innovation efforts. Under Mr. Colen's leadership, the Company will change its allocation of R&D resources to incorporate its newly established growth priorities, create technology Centers of Excellence, drive improved product development timing and efficiency, and expand the spectrum of new product opportunities. ***Mr. Colen most recently served as President of the Cardiac Rhythm Management Group***.

63. On February 11, 2010, BSX conducted its 4Q09 earnings call with investors and analysts. In addition to Elliott and Leno, BSX executives Neumann, Capello, Colen and two other senior executives participated in the call, along with representatives of 11 securities analyst firms. On the call, defendants revealed additional details regarding the hidden business risks and conditions that had led to the negative results and business restructuring, including the following statements by Elliott:

Dislikes, now let's look at what we didn't like.  Number one, **we didn't like how we got to our fourth quarter earnings.  To quote the old street phrase, "we got there ugly" but better on the number than under it.  We didn't like our gross margins, which fell for the second straight quarter although a large majority of the drop is due to two non-recurring events, the CRM advisory and third-party sourcing agreement**.

\*       \*       \*

Number three, we didn't like the response of St. Jude Medical to the disciplinary actions we took during December.  We exited from our company several sales representatives and managers who among other things repeatedly breached our healthcare professional Code of Conduct.  St. Jude has chosen to quickly hire many of our departed staff, we have invested extensively in building our HCP program under our new Chief Compliance Officer, Jean Lance.  We have strengthened our internal policy and act[ed] aggressively to [e]nsure ourselves [that] all of our customers facing employees comply with those policies.  We hope and expect our policies and overall approach [are] leading edge and executable globally.  We cannot control what others do.

**So-called greener pastures may allow for a more relaxed viewpoint towards HCP relationships.  The problem with pastures are, you have to be careful where you step.  By taking these chances, market share gains maybe created but these gains can be expensive and might go far into the future**.  In the short haul, we will for certain lose sales, but I believe in the long haul we will be held in high regard by those that count for our efforts in the healthcare professionals arena. Others may not be so fortunate.

64.     Chief Accounting Officer Capello added the following on the call:

Disciplinary measures that we took with a number [of] our U.S. CRM sales team members at the end of 2009 will have a negative effect on our U.S. CRM sales performance during 2010, despite having what we believe to be the best technology on the market.  These actions were necessary to insure that we realized our longer term sales potential of the CRM business.  In addition, we have begun to launch a newly approved version of cognizant intelligent with a strengthen header.  However, we lost some opportunity in the fourth quarter as a result of the subpectoral product advisory we issued and we could face some additional lost sales as we work to restore physician confidence.  **As a result, the CRM disciplinary and advisory measures could result in as much as $100 million less in sales in 2010, resulting in lower year-over-year growth rates.**

65.     This news came as a shock to investors because, during the Class Period, BSX had claimed that its business practices complied with the Code of Ethics established by the Advanced Medical Technology Association ("AdvaMed").  For example, in the Compliance and

- 33 -

Ethics section of its website, BSX stated: "We respect the obligation of health care professionals to make independent decisions that are in the best interest of patient care. Selection of medical devices should be based solely on their effectiveness, quality and value." BSX also claimed to be "an early supporter of the AdvaMed ethical code," and even provided a link to that code from its website.

66. The AdvaMed code governs interactions between medical equipment manufacturers such as BSX and physicians or other health care professionals involved in purchasing, or recommending the purchase of, medical equipment and supplies. The code contains strict proscriptions against the provision of inducements to health care professionals to purchase products, including prohibitions on the provision of entertainment and recreational activities, more than modest and occasional meals, and educational and promotional gifts. While the code permits certain research and educational grants and charitable donations, it expressly prohibits the use of such donations as an inducement to purchase goods, and further provides that "sales personnel should not control or unduly influence the decision of whether a particular Health Care Professional or institution will receive a grant or donation or the amount of such grant or donation."

67. Market analysts reacted negatively to these disclosures. As Credit Suisse wrote in its February 12, 2010 research report entitled "The Situation: Not Good":

> In cardiac rhythm management, the company gained share in 2009 however it now appears that such share gains may have been helped by questionable sales practices. Boston Scientific indicated it let go some CRM personnel due to noncompliance with the company's ethic policy. Boston Scientific also issued a CRM product advisory in December. The combination of the disciplinary actions and the product advisory may cost the company, by its own estimates, $100 million in revenues in 2010. All things considered, we do not believe the shares are attractive at current levels.

68.     On February 26, 2010, BSX issued its Report on Form 10-K for 2009.  Attached as Exhibit 10.67 to that report was the Corporate Integrity Agreement the Company had signed with HHS to resolve government investigations and regulatory actions resulting from the charitable contributions and other misconduct that had been used to illegally improve CRM sales.   The Corporate Integrity Agreement regulates, for a period of five years, every arrangement or transaction between BSX and any actual or potential source of business or referrals.  The agreement, among other conditions, provides for annual reporting and auditing requirements by an Independent Review Organization to assure compliance with federal laws and regulations, including the Anti-Kickback Statute; creation of a database to track all existing and new arrangements with health care professionals; prohibiting inducements to health care professionals; the adoption of policies to restrict compensation arrangements which provide financial incentives to engage in improper promotion, sales, marketing, pricing or contracting activities; and adoption of policies and procedures to control the use of charitable contributions to health care professionals.

69.     On March 2, 2010, former U.S. senator Warren Rudman and Walt Disney Co. Chairman John Pepper both unexpectedly announced they would be leaving BSX's Board of Directors.  Rudman had served on the Board since 1999 and Pepper since 2003.  No reasons were offered for their sudden departures.

70.     On March 12, 2010, BSX stock closed at $7.78 per share.

71.     On March 15, 2010, before the market opened, BSX stunned investors by announcing that it was suspending sales of and was recalling all of its ICD and CRT-D devices because it had changed the manufacturing process for the devices without obtaining FDA approval.  BSX's March 15, 2010 press release, entitled "Boston Scientific Announces Ship

Hold and Inventory Retrieval of ICD and CRT-D Devices," made clear that the investigation was ongoing, and that the full extent of the problems was not yet known:

> Boston Scientific Corporation announced today that it has stopped shipment and is retrieving field inventory of all its implantable cardioverter defibrillators (ICDs) and cardiac resynchronization therapy defibrillators (CRT-Ds).
>
> The Company has determined that some manufacturing process changes were not submitted for approval to the U.S. Food and Drug Administration (FDA). **At this time,** the company has identified two instances of changes that, while successfully validated, were not submitted to the FDA. Boston Scientific has informed the FDA and plans to work closely with the agency to resolve this situation as soon as possible.
>
> The Company has no indication that the manufacturing process changes pose any risk to patient safety, and it is not recommending explanation of the devices.
>
> Product families included in this advisory include: COGNIS®, CONFIENT™, LIVIAN™, PRIZM™, RENEWAL®, TELIGEN® and VITALITY™. The Company's pacemakers and other products are not affected by this advisory.
>
> "A planned process review revealed that two manufacturing process changes were not submitted for FDA approval," said Ray Elliott, President and Chief Executive Officer of Boston Scientific. "We are acting voluntarily and expeditiously to resolve this situation, and we have seen no evidence of any risk to patient safety. We apologize for the inconvenience these actions will cause patients and physicians."
>
> ***The Company plans to fully evaluate the impact of these actions on its financial results and provide an update when the evaluation is completed. Given the financial uncertainty involved, these actions could have a material impact on the Company's previously issued guidance, including revenue, operating profit and cash flows for the first quarter and full year of 2010***.

72.     On this news, BSX common stock dropped almost a dollar per share, closing at $6.80 – a 12.6% decline from its closing price of $7.78 on March 12, 2010, causing additional damages.

73.     When the recall was announced, BSX assured investors that it resulted from a mere "clerical error" and was therefore likely to be resolved in a matter of weeks by the FDA.

On March 29, 2010, the Company was forced to admit that the FDA had not agreed to an expedited review of the matter, suggesting the issues were more complex than previously indicated.   Some analysts predicted it could take months to resolve the issue, and that BSX could lose $469 million in sales over the next two years as a result.

74.     On March 30, 2010, *The Wall Street Journal* reported that the Justice Department and the SEC had opened investigations into the recall, "seeking company documents regarding the company's discovery that it hadn't gotten FDA approval, as well as communications with regulators, physicians and stock analysts about the withdrawal."

### COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

75.     Plaintiff incorporates ¶¶1-74 by reference.

76.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of BSX common stock during the Class Period.

- 37 -

78.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BSX common stock and suffered damages when that inflation was eliminated by disclosure of information that revealed the facts and conditions hidden by defendants' fraudulent statements and omissions, or the economic impact of those facts and conditions.  Plaintiff and the Class would not have purchased BSX common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

79.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of BSX common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

80.     Plaintiff incorporates ¶¶1-79 by reference.

81.     The Individual Defendants acted as controlling persons of BSX within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of BSX and their ownership of BSX stock, the Individual Defendants had the power and authority to cause BSX to engage in the wrongful conduct complained of herein.  BSX controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and BSX are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.       Awarding plaintiff reasonable costs and attorneys' fees; and

D.       Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  April 9, 2010                     **SHAPIRO HABER & URMY LLP**


                                          */s/ Thomas G. Shapiro*
                                          THOMAS G SHAPIRO
                                          THOMAS G. SHAPIRO (BBO #454680)
                                          ADAM M. STEWART (BBO #661090)
                                          53 State Street
                                          Boston, MA 02109
                                          Telephone: (617) 439-3939
                                          Facsimile: (617) 439-0134
                                          tshapiro@shulaw.com
                                          astewart@shulaw.com

                                          **ROBBINS GELLER RUDMAN
                                             & DOWD LLP**
                                          DARREN J. ROBBINS
                                          DAVID C. WALTON
                                          655 West Broadway, Suite 1900
                                          San Diego, CA 92101-3301
                                          Telephone:  (619) 231-1058
                                          Facsimile: (619) 231-7423
                                          darrenr@rgrdlaw.com
                                          davew@rgrdlaw.com

                                          **ROBBINS GELLER RUDMAN
                                             & DOWD LLP**
                                          SAMUEL H. RUDMAN
                                          58 South Service Road, Suite 200
                                          Melville, NY 11747
                                          Telephone: (631) 367-7100
                                          Facsimile: (631) 367-1173
                                          srudman@rgrdlaw.com

**ROBBINS GELLER RUDMAN
   & DOWD LLP**
DENNIS J. HERMAN
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
dennish@rgrdlaw.com

**VANOVERBEKE MICHAUD &
   TIMMONY, P.C.**
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: 313/578-1201
mvanoverbeke@vmtlaw.com
tmichaud@vmtlaw.com

***Attorneys for Plaintiff***

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      (a)     Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*City of Roseville Employees' Retirement System v. EnergySolutions, Inc., et al.*, No. 09-cv-08633 (S.D.N.Y.)
*City of Roseville Employees' Retirement System v. Sterling Financial Corporation, et al.*, No. 2:09-cv-00368-EFS (E.D. Wash.)

(b)     Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

(c)     Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*City of Roseville Employees' Retirement System v. Horizon Lines, Inc., et al.*, No. 08-cv-00969-HB (D. Del.)
*City of Roseville Employees' Retirement System v. Textron Inc., et al.*, No. 09-cv-00367 (D.R.I.)
*City of Roseville Employees' Retirement System v. Nokia Corporation, et al.*, No. 1:10-cv-00967-GBD (S.D.N.Y.)

BOSTON SCIENTIFIC

## SCHEDULE A

### SECURITIES TRANSACTIONS

#### Acquisitions

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 10/22/2009 | 1,944 | $8.49 |
| 01/13/2010 | 915 | $9.12 |

#### Sales

| Date<br>Sold | Type/Amount of<br>Securities Sold | Price |
|---|---|---|
| 09/17/2009 | 2,990 | $11.03 |
| 01/12/2010 | 339 | $9.16 |

*Opening position of 16,355 shares.