UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| *IN RE BOSTON SCIENTIFIC CORP.* ) | Civil Action No. |
| *SECURITIES LITIGATION* ) | 1:10-CV-10593-PBS |
| ) | |
| ) | |
| ) | |
| ) | |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

Robert J. Kaler, BBO No. 542040
Edward W. Little, Jr., BBO No. 628985
David Himelfarb, BBO No. 649596
McCarter & English LLP
265 Franklin Street
Boston, MA  02110
(617) 449-6500

*Attorneys for Defendants*

December 17, 2010

TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF THE CASE.................................................................................. 2

SUMMARY OF ARGUMENT ................................................................................ 4

ARGUMENT .......................................................................................................... 6

I.      THE AMENDED COMPLAINT FAILS TO IDENTIFY ACTIONABLE
        MISSTATEMENTS OR OMISSIONS BY ANY OF THE DEFENDANTS .................... 8

        A.      The Company's Forward Looking Statements Regarding the Impact of the
                CRM Group Dismissals Do Not Create Any Inference That Prior
                Disclosures Were Inadequate .................................................................... 8

        B.      The Defendants Had No Duty to Disclose the CRM Group Investigation
                and Dismissals (Which Were Disclosed When The Dismissals Occurred
                Anyway) During the Class Period ......................................................... 13

        C.      The Defendants' Statements During the Class Period Were Not
                Misleading............................................................................................... 17

                1.      The October 19, 2009 Press Release Statements ....................... 18

                2.      The October 20, 2009 Investor Conference Call Statements..... 19

                3.      The Form 10-Q filing on November 6, 2009 ............................ 22

                4.      The December 1, 2009 Piper Jaffray Healthcare Conference Call ............ 23

                5.      The Form S-3 Registration Statement, Prospectus, and Supplement ........ 23

                6.      The January 12, 2010 JP Morgan Healthcare Conference Call ................ 24

II.     THE AMENDED COMPLAINT FAILS TO PLEAD PARTICULARIZED
        FACTS SUFFICIENT TO CREATE THE REQUISITE STRONG INFERENCE
        OF SCIENTER ON THE PART OF ANY OF THE DEFENDANTS........................... 25

        A.      The Allegations of Purported "Facts That Give Rise to a Cogent Inference
                of Scienter" Are Plainly Insufficient...................................................... 27

        B.      There Are More Plausible, Non-Culpable Explanations For The
                Defendants Not Immediately Discussing The CRM Group Investigations
                and Dismissals ....................................................................................... 31

ME1 10989332v.5

C.     The Allegations in the Amended Complaint Are Insufficient to Create the Requisite "Strong" Inference of Scienter as to Any of the Individual Defendants ............................................................................................32

     1.     Allegations of Scienter as to Fredericus A. Colen .....................................32

     2.     Allegations of Scienter as to Sam R. Leno ................................................33

     3.     Allegations of Scienter as to J. Raymond Elliott ......................................33

III.     THE AMENDED COMPLAINT DOES NOT ADEQUATELY PLEAD LOSS CAUSATION ....................................................................................................34

IV.     THE AMENDED COMPLAINT DOES NOT ADEQUATELY PLEAD A VIOLATION OF SECTION 20(A) ................................................................35

CONCLUSION ...................................................................................................35

ME1 10989332v.5

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACA Fin. Guar. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ............................................................................6, 25, 26

*Acito v. IMCERA Group*,
47 F.3d 47 (2d Cir. 1995) ...................................................................................... 13

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ...............................................................................25, 26

*In re Alkermes Sec. Litig.*,
2005 U.S. Dist. LEXIS 25826, at *36 (D. Mass. October 5, 2005) ........................ 35

*In re Allaire Corp. Sec. Litig.*,
224 F.Supp. 2d 319 (D. Mass. 2002) ...................................................................... 21

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009) .......................................................................................8, 11

*Backman v. Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990) (en banc) .................................................................... 19

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................................ 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................7

*Bielski v. Cabletron Sys. (In re Cabletron Sys.)*,
311 F.3d 11 (1st Cir. 2002) .................................................................................... 29

*In re Boston Sci. Corp. Sec. Litig.*,
490 F. Supp. 2d 142 (D. Mass. 2007),
*rev'd on other grounds*, 523 F.3d 75 (1st Cir. 2008) ............................................. 34

*In re Boston Tech., Inc. Sec. Litig.*,
8 F. Supp. 2d 43 (D .Mass. 1998) ......................................................................22, 26

*Brody v. Stone & Webster, Inc. (In re Stone & Webster, Inc. Sec. Litig.)*,
414 F.3d 187 (1st Cir. 2005) .................................................................................. 35

*In re Brooks Automation Inc. Secs. Litig.*,
2007 U.S. Dist. LEXIS 88045 at *43-45 (D. Mass. Nov. 6, 2007) ........................ 35

*Chiarella v. United States*,
445 U.S. 222 (1980) ................................................................................................ 14

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) .................................................................... 21

ME1 10989332v.5

*In re Credit Suisse*,
 431 F.3d 36 (1st Cir. 2005) ..................................................................................25

*In re Cytyc Corp. Sec. Litig.*,
 2005 U.S. Dis. LEXIS 6166, at *84-85 (D. Mass. March 1, 2005).......................21

*Denny v. Barber*,
 576 F.2d 465 (2d Cir. 1978)...................................................................................26

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005)............................................................................................6, 34

*In re Elan Corp. Sec. Litig.*,
 543 F. Supp. 2d 187 (S.D.N.Y. 2008)........................................................5, 15, 31

*Ernst & Ernst v. Hochfelder*,
 425 U.S. 185 (1976)................................................................................................25

*Fitzer v. Security Dynamics Techs.*,
 119 F. Supp. 2d 12 (D. Mass. 2000) ......................................................................21

*In re Ford Motor Co. Sec. Litig.*,
 381 F. 3d 563 (6th Cir. 2004) .................................................................................17

*In re Glenayre Techs., Inc. Sec. Litig.*,
 982 F. Supp. 294 (S.D.N.Y. 1997), *aff'd*, 201 F.3d 431 (2d Cir. 1999) ...............14

*Greebel v. FTP Software, Inc.*,
 194 F.3d 185 (1st Cir. 1999) ..................................................................................26

*Greenstone v. Cambex Corp.*,
 777 F. Supp. 88 (D. Mass. 1991) ...........................................................5, 12, 16, 19, 20

*Gross v. Summa Four, Inc.*,
 93 F.3d 987 (1st Cir. 1996).......................................................................13, 14, 21, 25

*Higginbotham v. Baxter Int'l, Inc.*,
 495 F.3d 753 (7th Cir. Ill. 2007) .......................................................................14, 15

*Hoff v. Popular, Inc.*,
 2010 U.S. Dist. LEXIS 77788 (D.P.R. Aug. 2, 2010) .............................................6

*Horizon Asset Mgmt. v. H&R Block, Inc.*,
 580 F.3d 755 (8th Cir. 2009) .................................................................................32

*Iron Workers Local v. Hilb Rogal & Hobbs Co.*,
 432 F. Supp. 2d 571 (E.D.VA 2006) .....................................................................21

*Isham v. Perini Corp., et al*,
 665 F. Supp.2d 28 (D. Mass. 2009) .........................................................................6

*Lentell v. Merrill Lynch & Co., Inc.*,
 396 F.3d 161 (2d Cir. 2005)...............................................................................6, 35

*Maldonado v. Dominguez*,
 137 F.3d 1 (1st Cir. 1998) ......................................................................................25

iv

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd,* 312 Fed. Appx. 400 (2d Cir. 2009)..................30

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)..............................................................................5, 12

*Meyer v. Biopure Corp.*,
    221 F. Supp. 2d 195 (D. Mass. 2002) ..................................................................................29

*Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*,
    2010 U.S. Dist. LEXIS 21096 (E.D. Mo. Mar. 8, 2010) .......................................................32

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008).................................................................................................25

*Orton v. Parametric Tech. Corp.*,
    344 F. Supp. 2d 290 (D. Mass. 2004) .............................................................................21, 35

*In re Parametric Tech. Corp. Sec. Litig.*,
    300 F. Supp. 2d 206 (D. Mass. 2001) ..................................................................................35

*Parker v. Hurley*,
    514 F.3d 87 (1st Cir. 2008)...................................................................................................7

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    673 F. Supp. 2d 718 (S.D. Ind. 2009) ..................................................................................15

*In re Praecis Pharms., Inc. Sec. Litig.*,
    2007 U.S. Dist. LEXIS 22222 (D. Mass. Mar. 28, 2007)................................................19, 21

*Roeder v. Alpha Indus., Inc.*,
    814 F.2d 22 (1st Cir. 1987).......................................................................................14, 17, 19

*Rosenbaum Capital LLC v. Boston Communications Group, Inc.*,
    445 F. Supp. 2d 170 (D. Mass. 2006) ..................................................................................21

*Roth v. OfficeMax, Inc.*,
    527 F. Supp. 2d 791 (N.D. Ill. 2007) ...............................................................................30, 31

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris*,
    75 F.3d 801 (2d Cir. 1996)..................................................................................................13

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)..............................................................................................35

*Serabian v. Amoskeag Bank Shares, Inc.*,
    24 F.3d 357 (1st Cir. 1994).................................................................................................26

*Sharp v. Coopers & Lybrand*,
    649 F.2d 175 (3d Cir. 1981).................................................................................................35

*Shaw Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)...............................................................................................21

*Shurkin v. Golden State Vintners, Inc.*,
    471 F. Supp. 2d 998 (N.D. Cal. 2006), *affd,* 303 Fed. Appx. 431 (9th Cir. 2008) .................30

v

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2010).................................................................................32

*In re Sofamor Danek Group, Inc.*,
    123 F.3d 394 (6th Cir. 1997), *cert denied* 523 U.S. 1106 (1998)........................5, 12

*In re Sonus Networks Secs. Litig.*,
    2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006) .......................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................6, 7, 8, 11, 25, 26

*Zaluski v. United American Healthcare Corp.*,
    527 F.3d 564 (6th Cir. 2008) .............................................................................32

*Zucco Partners, LLC v. Digimare Corp.*,
    445 F. Supp. 2d 1201 (D. Or. 2006), *aff'd,* 552 F.2d 981 (9th Cir. 2009).............30

## Statutes

15 U.S.C. § 78j(b) ......................................................................................................2

15 U.S.C. § 78t(a) .......................................................................................................2

15 U.S.C. § 78u ..........................................................................................................1

15 U.S.C. § 78u-4(b)(2) ........................................................................................7, 26

15 U.S.C. § 78u-4(b)(l) ..............................................................................................7

## Rules

Fed. R. Civ. P. 9(b) .................................................................................................1, 7

Fed. R. Civ. P. 12(b)(6)........................................................................................1, 7, 8

## Regulations

17 C.F.R. § 240.10b-5................................................................................................2

vi

## INTRODUCTION

Boston Scientific Corporation ("Boston Scientific," "BSC" or "the Company"), J. Raymond Elliott ("Elliott"), James R. Tobin ("Tobin"),[1] Sam R. Leno ("Leno"), and Fredericus A. Colen ("Colen")[2] (collectively, the "Defendants") respectfully submit this Memorandum of Law, and the accompanying Appendix of Public Records ("App."), in support of their motion to dismiss the Amended Class Action Complaint ("Amended Complaint" or "AC") filed by Steelworkers Pension Trust and KBC Asset Management (the "Plaintiffs"), pursuant to Fed. R. Civ. P. 12(b)(6) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u ("PSLRA").

Although the Amended Complaint uses the technique of repeating the same allegations again and again, and interspersing them in different ways in different sections of the pleading,[3] it is impossible to avoid the conclusion, after careful scrutiny, that those allegations do not satisfy the requirements of the PSLRA, Fed. R. Civ. P. 9(b) and 12(b)(6) because they do not identify any actionable misstatements or omissions by the Defendants, do not plead with particularity facts giving rise to the requisite strong inference of scienter, and do not adequately plead that the Defendants' alleged misstatements and omissions proximately caused them to suffer economic loss.  For all of these reasons, as more fully set forth below, this purported class action should be dismissed, and the complaint already having been amended once, it should be dismissed with prejudice.

---

[1]   Tobin, former President and CEO of BSC, is named as a defendant in the caption of the AC, but he is not mentioned, nor are any allegations made against him, in the body of the AC. ***As such, he is entitled to have this action dismissed as against him***.

[2]   Colen, currently BSC's Executive Vice-President and Chief Technology Officer, is not named as a defendant in the caption of the AC, but he is mentioned, and allegations are made against him, in the body of the AC.

[3]   The allegation that BSC sales personnel were fired, for example, is repeated 28 times in 9 different sections of the AC.  *See* AC at ¶¶ 5, 6, 20, 22-26, 28-31, 34(iv), 85, 89, 91, 94, 98, 99, 105, 113, 114,115, 129, 135,138-140.  Sections II, II(B), VI, VII, VIII(B), VIII(D), VIII(E), VIII(L), and IX.

## STATEMENT OF THE CASE

The Amended Complaint contains two counts. Count I alleges that Boston Scientific and the named individual defendants, each a present or former officer of the Company, violated Section 10(b) of the Securities Exchange Act of 1934 ("SEA"),[4] 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder,[5] by making material misrepresentations or omissions during investor conference calls, in press releases and in the Company's filings with the SEC, during the period October 20, 2009 to February 11, 2010 (the "Class Period"). *See* AC ¶¶ 154-158. Count II of the Amended Complaint further claims that the Defendants are liable as "controlling persons" under § 20(a) of the SEA, 15 U.S.C. § 78t(a). Both claims are loosely based on the following:

**(1)** Boston Scientific's dismissal (which was not secret, and was the subject of commentary on the internet at the time[6]), in December of 2009, of 10 members of its Cardiac Rhythm Management ("CRM") Group sales force (out of a total CRM Group sales force of approximately 1,100) following an internal investigation earlier in the year; the subsequent hiring of several of them by a competitor of the Company in January of 2010, and the

---

[4]   Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

[5]   Rule 10b-5, in turn, forbids any person, directly or indirectly, "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

[6]   *See, e.g.,* App. at Exh. 1 (Internet posting on a website known as "cafepharma.com, the Website for pharmaceutical and medical sales professionals," dated December 9, 2009) ("***What is up with Doug Knock [sic], John Knighted [sic], and Ken Nelson getting AXED?***" "Sounds like a lot more to come. ***This comes after a long investigation involving customers.***"). *Id.* at Exh. 2 (Internet posting dated December 17, 2009)(" *... **now that BSC has fired less than a dozen reps**,* the company is going to go under? Really? ... I hardly think this action spells the end of the company.").

2

Company's announcement, on February 11, 2010, that the dismissals, and a product advisory issued by the Company in December 2009 advising physicians to refrain from using several of the Company's implantable cardiac defibrillator products,[7] were together expected to have a negative effect on CRM product sales revenues in 2010 of up to $100 million;[8]

(2)     a drop in Boston Scientific's stock price on February 11, 2010 from $8.29 at the opening of the market to $7.47 at market close, allegedly "as a direct and proximate result of the February 11, 2010 pre-opening announcements," which also included announcement of (a) the Company's Fourth Quarter and Year-End 2009 financial results, (b) a major management restructuring, and (c) other market challenges faced by the Company;

(3)     Boston Scientific's receipt, on September 25, 2009, of a subpoena from the U.S. Department of Health and Human Services ("HHS") requesting records relating to contributions or payments made by the Company to health care providers or their affiliated entities or charities, which the Company reported in its November 6, 2009 Form 10-Q SEC filing;[9]

(4)     a series of conclusory statements, as to which the Amended Complaint does not make *any* particularized factual allegations other than (1), (2) and (3) above, claiming that the 8% growth in CRM Group sales for the 3rd Quarter of 2009 reported by the Company on October 20, 2009 was "inflated" and "fueled" by unethical sales practices within the CRM sales force,[10] and that the price of Boston Scientific stock was "artificially inflated" during the period from October 20, 2009 to February 11, 2010 (the "Class Period"), *see* AC at ¶¶ 130, 132, 134; and

---

[7]   *See* AC ¶¶ at 32, 95, 136.  *See also* App. at 3, p. 1742 ("we lost some opportunity in the fourth quarter as a result of the subpectoral ***product advisory*** we issued and could face some additional lost sales as we work to restore physician confidence.") (emphasis added).

[8]   *See* AC at ¶¶ 5, 20, 24-26, 28-29, 31.

[9]   *See* AC at ¶¶ 16, 21.

[10]   *See* AC at ¶¶ 4, 19, 34, 73, 74, 79, 80, 129.

**(5)**     the claim that various statements made by the Defendants during the Class Period were "materially misleading" because, although none was false on its face, each was rendered actionable by the speaker's failure to simultaneously disclose the above items (l), (3) and (4), and the argument that a series of enumerated "facts" supposedly support "a strong inference" that those statements were made by the Defendants with "scienter" - *i.e.* intent to defraud.[11]

## SUMMARY OF ARGUMENT

The allegations in the Amended Complaint fail to state a valid securities fraud claim, first, because at the time the Defendants made the referenced statements during the Class Period, they had no legal obligation to disclose the then-pending internal investigation of the CRM Group sales force, or the subsequent terminations of the 10 Boston Scientific CRM Group sales personnel (which became publicly known when they occurred anyway, *see* footnote 6, *supra*), nor did they have any obligation to say any of the other unproven allegations that the AC claims they should have said -- such as that the Company's sales revenues in the Third Quarter of 2009 were somehow "inflated and fueled" by unethical practices,[12] that "the reported 8% growth could not have been achieved without the repeated unethical conduct of certain CRM sales personnel," AC at ¶ 4, or that the Company's stock price during the Class Period was "inflated."[13]

None of the particularized factual allegations in the Amended Complaint, even if true, would be legally sufficient to establish any of these unproven allegations, and without pleading particularized facts which, if true, would be sufficient to prove these allegations, the Amended

---

[11]    *See* AC at ¶¶ 101-129.

[12]    *See* AC at ¶ 4.  There are **no particularized allegations** in the AC, and it is not the case, that the allegedly unethical sales activities being investigated by the Company in the Fall of 2009, which led to the December 2009 dismissals, actually occurred in the Third Quarter of 2009, let alone that they "fueled" the company's sales figures during that time.  *Id.* at 4, 5, 19, 22, 34, 74, 79, 80, 83, 129, 130.

[13]    *See* AC at ¶¶ 130, 134.  The AC offers **no particularized allegations** in support of its argument that BSC's stock price during the Class Period was "artificially inflated."  *See* App. at Exh. 4.

Complaint does not state a valid legal claim that the Defendants had any obligation to **_state_** them (let alone that any of the defendants *thought* they had any such obligation). That is why this and other courts have **_repeatedly rejected_** the theory that failure to disclose evidence of illegal or unethical conduct during a particular period, even assuming it existed, renders the reporting of objectively accurate financial information for that period "misleading."[14]

Second, the facts pled in the AC do not create the requisite "strong" inference of *scienter* on the part of the Defendants. To the contrary, stripped of its argumentative verbiage, the AC pleads a sequence of events that, if anything, suggests that the Defendants bent over backwards to **_disclose_**, as early as was reasonable and prudent, their "safe harbor" estimates as to the potential future impact on the Company's CRM product sales going forward of both the December 2009 terminations and January 2010 hiring of a number of the terminated personnel by a competitor, and the new CRM product advisory to physicians.

The AC's alternative attempt to satisfy the scienter requirement by pleading the theory that the Defendants "had a motive to conceal the repeated ethical violations by the CRM sales group" supposedly "in order to offer $2 billion in Senior Notes on terms more favorable to Boston Scientific than if the truth about CRM future sales and revenues had been known by investors," AC at ¶ 129, is also unavailing, both because no particularized factual allegations support it, and because that theory too has been repeatedly rejected by the courts. *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 215-16 (S.D.N.Y. 2008) (rejecting scienter allegation

---

[14]   *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) ("Absent an allegation that MMC reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability"), *citing Greenstone v. Cambex Corp.*, 777 F. Supp. 88, 91 (D. Mass. 1991) (holding that the allegation that the defendants "misrepresented the financial status of Cambex because they failed to disclose the fact that Cambex and the other defendants engaged in unlawful practices which influenced the revenues of Cambex" was insufficient to support a 10b-5 claim), *aff'd* 975 F.2d 22 (1st Cir. 1992); *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 & n.3 (6th Cir. 1997), *cert. denied* 523 U.S. 1106 (1998).

based on claim that "Elan needed to conceal negative information about Tysabri in order to complete a $ 1.15 billion senior notes offering used to fund development of Tysabri").[15]

Third, the facts pled in the Amended Complaint do not adequately support a finding of loss causation, because to satisfy that requirement, a plaintiff must allege "that the loss be caused by the materialization of the concealed risk." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 171 (2d Cir. 2005). Plaintiffs cannot allege that here with respect to the December dismissals, because the risk in question - that the Company's business could suffer if it lost sales personnel - was not concealed; it was repeatedly disclosed in the very public filings cited in the AC.

## ARGUMENT

To state a claim under Section 10(b) of the SEA, a plaintiff must specifically identify (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation." *Dura Pharms., Inc.* v. *Broudo,* 544 U.S. 336, 341-342 (2005). *See also Isham v. Perini Corp.,* 665 F. Supp. 2d 28, 34 (D. Mass. 2009). Under federal law, the pleading requirements for such claims are unusually stringent. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)(noting the "[e]xacting pleading requirements" of the PSLRA). In addition to the basic Federal Rule of Civil Procedure

---

[15] *See also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 67 (1st Cir. 2008) (finding no scienter because, among other things, "[t]here are no allegations that the proceeds from the Bradford bonds would be spent on anything that would personally enrich any of the Bradford defendants."); *Hoff v. Popular, Inc.*, 2010 U.S. Dist. LEXIS 77788, at *44-45 n.10 (D.P.R. Aug. 2, 2010) ("Plaintiffs put forth a motive theory of scienter, however they have not pled any concrete and personal benefit to the Officer Defendants. The Officer Defendants' motive to protect the Company from financial jeopardy … is a goal shared by all corporate officers …. The important consideration is whether 'defendants benefited in some concrete and personal way from the purported fraud.'") (citation omitted); *In re Sonus Networks Secs. Litig.*, 2006 U.S. Dist. LEXIS 28272, at *53-54 (D. Mass. May 10, 2006) ("Directors and officers of all public companies feel the same pressure to maximize the company's value …. .").

ME1 10989332v.5

governing fraud claims, which requires that "all averments of fraud or mistake ... shall be stated with particularity," *see* Fed. R. Civ. P. 9(b), the PSLRA further provides that a complaint alleging securities fraud must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(l).  In interpreting this requirement, the Supreme Court has held that "the [PSLRA] requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 313.

As to the scienter requirement, the PSLRA further requires that in order to survive a motion to dismiss, a securities fraud complaint must "state with particularity facts giving rise to a **strong** inference that the defendant acted with the requisite state of mind," 15 U.S.C. § 78u-4(b)(2)(emphasis added), and the Supreme Court has held that in order to qualify as strong, "an inference of scienter **must be more than merely plausible or reasonable--** it must be cogent and **at least as compelling as any opposing inference of nonfraudulent intent.**" *Tellabs,* 551 U.S. at 314 (emphasis added).  The Supreme Court has also held that in making that determination, the court must consider "not only inferences urged by the plaintiff. . . **but also competing inferences rationally drawn from the facts alleged**." *Id.* (emphasis added).

The Supreme Court has also recently held that when considering a motion to dismiss <u>any</u> kind of claim (including a securities fraud claim) under Fed. R. Civ. P. 12(b)(6), the court must decide whether the complaint alleges enough facts to "raise a right to relief above the speculative level," and affirmatively shows an entitlement to relief.  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  In so doing, the court accepts as true all well-pleaded facts and draws all reasonable inferences in the plaintiffs' favor, *see Parker v. Hurley,* 514 F.3d 87, 90 (1st Cir. 2008), but "where the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged--but it has not 'show[n]'--'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949-50 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

## I.   THE AMENDED COMPLAINT FAILS TO IDENTIFY ACTIONABLE MISSTATEMENTS OR OMISSIONS BY ANY OF THE DEFENDANTS

### A.   The Company's Forward Looking Statements Regarding the Impact of the CRM Group Dismissals Do Not Create Any Inference That Prior Disclosures Were Inadequate

The crux of the Amended Complaint is the allegation that purchasers of Boston Scientific's stock during the Class Period were defrauded as a result of alleged "misrepresentations" and "omissions" by the Defendants relating to an internal audit of sales force expense reports in the Company's CRM Group, which the AC alleges was begun in August of 2009, and culminated in the dismissal for ethics violations, in December of 2009, of 10 CRM group sales personnel, several of whom were subsequently hired by a competitor of Boston Scientific, St. Jude Medical, in early 2010.

According to the AC and the various materials cited in it, which this Court considers in deciding a motion to dismiss,[16] the impact of the dismissals was discussed by the Defendants in a February 11, 2010 conference call with investors at the same time Boston Scientific announced its year-end financials for 2009, its revenue projections for 2010, several product advisories, a major management restructuring, and a number of other challenges it faced in the coming year.[17] The record shows that during that conference call, in a discussion preceded by the customary

---

[16]   *See Tellabs,* 551 U.S. at 322-323 (in deciding a motion to dismiss "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

[17]   *See* App. at Exh. 3, pp. 1726-1746.

"Safe Harbor Statement" caveats for forward looking statements,[18] the Company's CEO, Elliott,

said the following about the Company's Fourth Quarter 2009 performance:

> … Let me begin with a more qualitative review of our businesses and then as usual I'll share some brief thoughts on the likes, dislikes, and hot topics *for the quarter overall*.  * * * [paragraphs omitted]
>
> *Dislikes.  Now let's take a look at what we didn't like.  Number one, we didn't like how we got to the fourth quarter earnings.  To quote the old street phrase, "we got there ugly" but better on the number than under it.*  We didn't like our gross margins which fell for the second straight quarter although a large majority of the drop is due to two non-recurring events, the CRM advisory and the third party sourcing agreement. … Gross margins remain an area of concern and intense focus … However, we expect to see these lower levels of gross margin throughout 2010 as we rebuild the business.
>
> Number two, we didn't like the lingering impacts on our DES mix based on clinical data at TCT . . . we have officially objected to the irresponsible claims published in the Lancet … * * * [paragraphs omitted]
>
> Number three, we didn't like the response of St. Jude Medical to the disciplinary actions we took during December.  *We exited from our Company several sales representatives and Managers who among other things repeatedly breached our healthcare professional Code of Conduct. St. Jude has chosen to quickly hire many of our departed staff,* we have invested heavily in building our HCP program under our new Chief Compliance Officer, Jean Lance. … *In the short haul, we will for certain lose sales,* but I believe in the long haul we will be held in high regard by those that count in our efforts in the healthcare professionals arena. Others may not be so fortunate.
>
> Number four, another thing we didn't like was an article that appeared in the Journal HeartRhythm on a single patient who had been implanted subcutaneously with a COGNIS CRTD.  …  HeartRhythm was completely out of line to publish this article prematurely, …* * * [paragraphs omitted]
>
> Number five, last on the dislike list is our flat growth in the fourth quarter, and modest year over year sales growth. … Our guidance for next year indicates only slight growth against [*sic*] difficult headwinds facing the entire industry.  . . .

---

[18]   *See* App. at Exh. 3, p. 1726 ("Before we begin *I'd like to remind everyone of our Safe Harbor Statement*.  This call contains forward-looking statements.  The company wishes to caution the listeners that *actual results may differ from those discussed*")(emphasis added).

App. at Exh. 3, pp. 1733, 1739-1740 (emphasis added).  The AC, at ¶¶ 31, 93, and 94, quotes only the portions of Elliott's statement that are italicized above, and alleges that his statement "we got there ugly" related to the CRM Group firings, but the above-quoted transcript of the call shows that in fact that statement related to reduced gross margins, not the CRM Group dismissals.  *See* p. 8-9, *supra*.

The Amended Complaint then quotes, in paragraph 95, the following statement of Boston Scientific CFO Jeff Capello during the same February 11, 2010 conference call, in which Mr. Capello explained, among other things, that in the opinion of management, the **combination** of a recent product advisory concerning BSC's "Teligen" and "Cognis" subpectoral defibrillator products[19] and the December 2009 dismissals of CRM Group sales personnel (several of whom had just been hired by St. Jude Medical), would likely have a negative impact of "as much as $100 million less" in CRM product sales in 2010:

> … As we exit 2009 we face a number of challenges.  The growth of the worldwide CRM market remains low and we estimate the defib market growth to be around 2% in the U.S., approximately 6% internationally, and 4% worldwide.
>
> *Disciplinary measures that we took with a number of our U.S. CRM sales team members at the end of 2009 will have a negative effect on our U.S. sales performance in 2010,* despite having what we believe to be the best technology on the market.  These actions were necessary to insure we realized our longer term sales potential of the CRM business.  In addition, we have begun to launch a newly approved version of cognizant intelligent [*sic* Cognis and Teligen] with a strengthen[sic] header; however we lost some opportunity in the fourth quarter as a result of the subpectoral product advisory we issued and we could face some additional lost sales as we work to restore physician confidence. As a result**,** *the CRM disciplinary and advisory measures could result in as much as $100*

---

[19]  A "subpectoral defibrillator" is a defibrillator designed to be implanted under the pectoral muscle. On December 1, 2009, BSC issued a product advisory, *see* App. at Exh. 5, in which it advised physicians to avoid implantation of its Cognis and Teligen subpectoral defibrillators until it could complete improvements to the devices, and to have patients who already had the implants check in once every three months and report any shocks they had received.

> *million less in sales in 2010, resulting in lower year over year growth rates.*

App. at Exh. 3, p. 1742 (italics added).   As to this statement, the Amended Complaint again quotes only the portions italicized above, *see* AC at ¶ 95, omitting the portions of the statement which show that the projected $100 million future sales loss was being attributed not just to the December 2009 sales force dismissals, but also to the product advisory that the Company had issued in the Fourth Quarter of 2009.

The AC then pleads that "market analysts" reacted negatively to the Company's February 11, 2010 disclosures about the expected $100 million reduction in 2010 sales revenue, *see* AC at ¶ 98, and that a Credit Suisse report entitled "The Situation: Not Good" suggested that the Company's market share gains in 2009 "may have been helped by questionable sales practices," *See* AC at ¶¶ 98, 140.   The AC does not allege any particularized facts supporting this suggestion, however, nor does the Credit Suisse report.   Thus, this suggestion carries no weight on motion to dismiss, *see Iqbal,* 129 S.Ct. at 1949,[20] is not presumed to be true, *see id.*, and does not satisfy the PSLRA's requirement of particularized pleading.   *See Tellabs*, 551 U.S. at 313.

The same is true with respect to the conclusory allegations in the Amended Complaint that "the reported growth in CRM sales was inflated and fueled by unethical sales practices within the CRM sales force" and "the reported 8% growth could not have been achieved without the repeated unethical conduct of certain CRM sales personnel." AC at ¶ 4.   *See also*, *id*. at ¶¶ 34, 82, 114, 129.   Literally no facts are pled to support these conclusions.   *See* AC.   Moreover, as discussed previously, this and other courts have repeatedly rejected the argument that undisclosed evidence of illegal or unethical conduct during a particular period, even assuming it

---

[20]   In *Iqbal,* the Supreme court specifically held that "where the well-pleaded facts do not permit the court to infer more than ***the mere possibility*** of misconduct, the complaint has alleged--but it has not 'show[n]'--'that the pleader is entitled to relief.'" 129 S.Ct. at 1950 (emphasis added).

exists, renders accurate revenue or growth figures for that period "misleading."[21]

The AC then quotes the opinion in the Credit Suisse report that "all things considered, we do not believe the shares are attractive at current levels" but omits the first half of the paragraph that it quotes, which makes clear that this conclusion was based on much more than the CRM Group dismissals, and included the fact that "Boston Scientific earnings **have been flat** for the past three years," and that "[t]he company is heavily weighted to the coronary stent and cardiac rhythm management markets, **two markets that we do not find to be particularly attractive** at the present time." *Id.* (emphasis added).[22]

The AC also fails to note other portions of the Report which questioned whether the $100 million revenue reduction estimate for 2010 would ever actually materialize.[23]  Instead, working backwards from that "forward-looking" estimate, the AC attempts to construct a securities fraud claim by suggesting that BSC's February 11, 2010 projection of "as much as $100 million less" in CRM Group revenue in 2010 is itself evidence that for several months **prior** thereto, the Defendants wrongfully concealed material information about the CRM Group investigation and dismissals, and their impact on the BSC's business. AC at ¶¶ 94, 95.  This, however, is a legal *non-sequitur*, because the fact that the Company offered a prompt forward looking assessment of

---

[21]  *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) ("Absent an allegation that MMC reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."), *citing Greenstone v. Cambex Corp.*, 777 F. Supp. 88, 91 (D. Mass. 1991) (holding that the plaintiffs' allegation that the defendants "misrepresented the financial status of Cambex because they failed to disclose the fact that Cambex and the other defendants engaged in unlawful practices which influenced the revenues of Cambex" was insufficient to support a 10b-5 claim), *aff'd* 975 F.2d 22 (1st Cir. 1992); *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 & n.3 (6th Cir. 1997), *cert. denied* 523 U.S. 1106 (1998).

[22]  *See* App. at Exh. 6, p. 4.

[23]  In this regard, the Report states, on page 7, that "Management estimates the impact to the CRM at about $100 million in 2010, which also includes potential revenue losses as a result of the subpectoral product advisory for Cognis and Teligen last December. **_In our view, the $100 million seems a bit large._**"   App. at Exh. 6, p. 7 (emphasis added).

12

the expected impact of the CRM Group dismissals, and the product advisory, does not in this case support an inference that the Defendants' prior disclosures were inadequate,[24] nor does the Amended Complaint's argument about Boston Scientific's subsequent response to an SEC inquiry letter support such a claim.[25]   In fact, the timing of the Company's announcement of this "forward looking" estimate, only weeks after it became clear that a number of the sales people the Company had dismissed had been hired by a competitor, creates a powerful inference that the Company was bending over backwards to **disclose** these events, and their potential to adversely affect CRM Group sales in the coming year, **as early as practicable**.   It does not support an inference of actionable non-disclosure.

### B.   The Defendants Had No Duty to Disclose the CRM Group Investigation and Dismissals (Which Were Disclosed When The Dismissals Occurred Anyway) During the Class Period

In this regard, it is well-settled that there is no general duty to disclose nonpublic material information under the securities laws.   As the First Circuit held in *Gross v. Summa Four, Inc*., 93 F.3d 987 (1st Cir. 1996), "[b]y itself … Rule 10-b5, does not create an affirmative duty of disclosure.   Indeed, a corporation does not commit securities fraud merely by failing to disclose

---

[24]   *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris,* 75 F.3d 801, 812 (2d Cir. 1996) (one cannot infer, from the fact that a decline in sales was announced, that company had a duty to disclose same in prior prospectus statements weeks earlier); *Acito v. IMCERA Group*, 47 F.3d 47, 53 (2d Cir. 1995) ("[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.").

[25]   In this regard, ¶ 33 of the AC misleadingly argues, based on selective quotes from a May 21, 2010 letter that the Company sent to the SEC responding to questions about its 2009 Form 10-K and First Quarter 2010 Form 10-Q filings, that in the letter the Company was "[i]n essence admitting the deficiencies in its 2009 disclosures." *Id.*   A review of the letter itself, though, shows that this is not the case, and that in it, BSC reported that *"the aforementioned terminations of 10 sales personnel represented less than one percent of our CRM sales force and had* _an_ _immaterial_ _impact_ *on our net sales during the fourth quarter of 2009*," and confirmed that "in future filings, to the extent our businesses experience significant changes in revenues from period to period, we will discuss all material factors contributing to these changes."   App. at Exh. 7, p. 2 (emphasis added).   Clearly, this was not an "admission" that prior disclosures about the impact of the terminations had been inadequate.   It was simply a confirmation, in response to a specific question, that material factors contributing to changes in the company's revenues would be disclosed for future periods.

13

all nonpublic material information in its possession …. ***The corporation must first have a duty to disclose*** the nonpublic material information before the potential for any liability under the securities laws emerges." *Id*. at 992 (emphasis added),[26] *citing Roeder v. Alpha Indus., Inc*., 814 F.2d 22, 26 (1st Cir. 1987)("there is no liability under Rule 10b-5 unless there was a duty to disclose it."), *quoting Chiarella v. United States*, 445 U.S. 222, 235 (1980).

Such a duty arises only when (1) a statute or regulation requires disclosure, (2) a corporate insider trades on confidential information, or (3) a corporation makes incomplete or misleading disclosures. *See Roeder*, 814 F. 2d at 26. Otherwise, a corporation has no affirmative duty to disclose all material information. *Id*. at 27. While the SEC does require timely (*i.e*., within four business days) disclosure of certain categories of information through the filing of a Form 8-K, the information that the AC claims should have been disclosed here does not fall into any of those categories. *See* App. at Exhs. 8-9 (General Instructions for Form 8-K (SEC Form 873) and 69 Fed. Reg. 15594 (Mar. 25, 2004).

Likewise, the decision as to **when** to disclose adverse facts is a matter left to the business judgment of a company's officers and directors. *See In re Glenayre Techs., Inc. Sec. Litig*., 982 F. Supp. 294, 297 (S.D.N.Y. 1997) ("[D]efendants had a right to ensure that any announcement regarding the possible impact of the [adverse event] be accurate and the timing of such an announcement is a matter of business judgment."), *aff'd*, 201 F.3d 431 (2d Cir. 1999). *See also Higginbotham v. Baxter Int'l, Inc*., 495 F.3d 753, 760 (7th Cir. 2007) ("Firms regularly learn financial information between quarterly reports, and they keep it under their hats until the time arrives for disclosure…. Silence is not 'fraud' without a duty to disclose…. ***The securities laws***

---

[26]  Further, an "omitted fact will be considered material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *Gross*, 93 F.3d at 992 (*citing Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

*create a system of periodic rather than continual disclosures*.") (emphasis added).

It is also well-settled that absent affirmatively misleading statements on the subject, a company has no duty to disclose internal investigations of wrongdoing until the results are known and their impact on the business, if material, is fully understood.[27]   In addition, and perhaps more importantly, no company is obliged to issue the kind of "*mea culpa*" confession of its sales being supposedly "fueled" and "inflated" by unethical sales practices that the Amended Complaint claims should have been issued as early as October of 2009, *see* AC at ¶¶ 4, 34, 82, 114, 129, when no alleged facts support that claim.[28]   Nevertheless, the Amended Complaint mistakenly argues that the Defendants had to do just that -- based on the theory that

> *whenever* Defendants discussed *the topic of CRM sales growth*, they misrepresented and omitted the material fact that the reported growth in CRM sales was inflated and fueled by unethical sales practices within the CRM sales force.  Thus, the reported 8% growth could not have been achieved without the repeated unethical conduct of certain CRM sales personnel, which was concealed from investors.

AC at ¶ 4 (emphasis added).  There are **two problems** with this theory.  First, as noted above, no particularized facts are pled which would logically support the conclusory claim that "the reported 8% growth could not have been achieved without the repeated unethical conduct of certain CRM sales personnel," AC at ¶ 4.  Second, the argument that undisclosed evidence of

---

[27]   The law is clear that Boston Scientific did not have any obligation to discuss the CRM Group investigation before it was concluded and its impact understood.  *See Higginbotham*, 495 F.3d at 760-61 ("Prudent managers conduct  inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention … ***Taking the time necessary to get things right is both proper and lawful***. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.")(emphasis added).  *See also Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc*., 673 F. Supp. 2d 718, 738 (S.D. Ind. 2009); *In re Elan Corp. Sec. Litig*., 543 F. Supp. 2d 187, 217 (S.D.N.Y.  2008) ("Defendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises.").

[28]   In this regard, it is obvious that the mere pendency of an investigation into CRM Group sales expense reports, which is not alleged to have even related to activities in the Third Quarter of 2009, would not make out a *prima facie* case that sales revenues in that quarter (or indeed at any time) had ever actually been "inflated" or "fueled" by unethical practices.

illegal or unethical conduct during a particular period renders accurately reported revenue or growth figures for that period misleading is faulty, and has been repeatedly rejected by courts.

In *Greenstone v. Cambex Corp.*, 777 F. Supp. 88, 91 (D. Mass. 1991), *aff'd* 975 F.2d 22 (1st Cir. 1992), for example, this Court dismissed a 10b-5 claim relying on the same theory advanced by the Plaintiffs here, that "the defendants made material misrepresentations and omissions in their press releases and filings … because they failed to disclose the fact that Cambex and the other defendants engaged in unlawful practices which influenced the revenues of Cambex." *Id.* at 89.  In doing so, the *Cambex* court explained that

> the complaint claims that various financial statements issued by the Defendant Cambex as to the revenue figures reported were false, *not because the revenue figures themselves were not accurate, but rather that the source of some revenue was derived from unlawful practices*, namely, the sale of "memory" components converted by the defendants, and that this misconduct was not disclosed and should have been. *The failure to disclose the unlawful practices allegedly rendered the revenue figures and other statements false and misleading in violation of Rule 10b-5.*

*id.* at 90 (emphasis added), and that:

> [t]he plaintiff does not allege … that Cambex did not experience the financial success described in its quarterly and annual reports. She argues instead that the reports would have been more accurate and complete if the defendants had revealed their improper activities because such activities allegedly influenced the financial success of Cambex.  Beyond such vague references to the "false portrayal" of revenues, *the plaintiff does not state how records and statements made by Cambex were false or inaccurate.*

*Id.* at 91 (emphasis added).  Similarly, the Amended Complaint here does not allege that the statements concerning 8% growth in CRM Group revenues in the Third Quarter of 2009, for example, were "false or inaccurate" as a result of the alleged existence of the unethical sales practices under investigation during that period, and in rejecting the argument that such falsity could be presumed from the mere fact that some kind of improper conduct had allegedly occurred, the *Cambex* court held that:

16

> Certainly, the information about the defendants' improper activity was material insofar as "a reasonable investor might have considered [it] important in the making of [the investment] decision." *Roeder v. Alpha Industries, Inc.*, at 25; however, the materiality of information alone does not create a duty to disclose such information. ***As the defendants had no duty to disclose information about their illegal business practices, they cannot be liable under Rule 10b-5.***

*Id.* (emphasis added).  The same conclusion is warranted in this case.

The further argument in the AC that the Defendants' positive statements about the prior quarter and year were misleading because they knew at the time about the "inevitable material negative impact on BSC's **future** CRM sales … and loss of **future** CRM sales," AC at ¶¶ 34 (emphasis added), is also insufficient to establish a 10b-5 violation because it is also well-settled that the disclosure of accurate historical data does not become misleading even if at the time less favorable results might be predictable by the company at the time the historical information is released.  *See In re Ford Motor Co. Sec. Litig.,* 381 F. 3d 563, 570 (6th Cir. 2004)("disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company….") (citation omitted).

## C.  The Defendants' Statements During the Class Period Were Not Misleading

Disregarding these well-settled principles, the Amended Complaint attacks a series of statements that the Defendants made on six discrete occasions in late 2009 and early 2010: **(1)** in BSC's October 19, 2009, press release concerning its Third Quarter 2009 financial results; **(2)** in BSC's October 20, 2009 conference call with analysts to discuss those Third Quarter 2009 results; **(3)** in BSC's Third Quarter 2009 Form 10-Q filed with the SEC on November 6, 2009; **(4)** during a December 1, 2009 Piper Jaffray Healthcare conference call; **(5)** in BSC's Form S-3 Registration Statement and Prospectus filed with the SEC on December 11, 2009, and a Supplement to that Prospectus filed on December 14, 2009; and **(6)** during a January 12, 2010, JP Morgan Healthcare conference call.  Careful examination of these statements, however,

17

shows that, given the context in which they were made, and taken together with everything else which was publicly known about the Company, none of them triggered a duty to disclose the CRM Group investigation or dismissals prior to the time the Company did so.

### 1. The October 19, 2009 Press Release Statements

As to the first occasion, for example, the Amended Complaint selectively alleges that the *italicized* phrases in the following part of the Company's October 19, 2009 press release were "materially false and misleading":

> BOSTON SCIENTIFIC ANNOUNCES RESULTS FOR
> THIRD QUARTER ENDED SEPTEMBER 30, 2009
>
> Natick, MA (October 19, 2009) -- Boston Scientific Corporation (NYSE: BSC) today announced financial results for the third quarter ended September 30, 2009, as well as guidance for net sales and earnings per share (EPS) for the fourth quarter and full year 2009.
>
> Third quarter highlights (Sales growth rates are constant currency):
>
> • Increased sales three percent to $2.025 billion and achieved adjusted EPS of $0.19, both within the Company's guidance ranges
>
> • Reported GAAP EPS of $0.13, at the high end of the Company's range
>
> • Maintained leadership position in the worldwide drug eluting stent (DES) market with a 41 percent share, including a 49 percent share of the U.S. market and a 47% share of the Japanese market
>
> • *Increased worldwide cardiac rhythm management (CRM) product sales eight percent*
>
> • Increased worldwide Endosurgery sales eight percent, including a ten percent increase in Endoscopy sales
>
> • Increased worldwide Neuromodulation sales 21 percent
>
> • Prepaid $225 million of term loan debt
>
> • Settled 14 outstanding patent litigation matters…
>
> *"So far this year, CRM market growth has not been as strong as expected, but our CRM business has continued to grow, and we have not seen the slowdown in hospital stocking described by St. Jude,"* said Ray Elliott,

18

> President and Chief Executive Officer of Boston Scientific.  "In DES, we maintained our worldwide leadership position.  . . . .
>
> Net sales for the third quarter of 2009 were $2.025 billion, as compared to net sales of $1.97 billion for the third quarter of 2008 ….

(italics added), supposedly because they did not disclose that, "to the extent there was sales growth," in the CRM Group, the company's CRM sales force had been "inflating demand" through the use of improper inducements to health care professionals in violation of BSC, industry, and governmental ethical codes, and was "under investigation for doing so."  *See* AC at ¶ 74, referring to statements in ¶¶ 70-71.

As noted previously, however, the Amended Complaint pleads no particularized facts to support its conclusory assertion that "to the extent there was sales growth" in the third quarter of 2009 (the quarter on which these statements were reporting), it was the result of the sales force "inflating demand" through the use of "improper inducements to health care professionals," *see* p. 20, Footnote 24, *supra*, and without pleading facts which, if true, would show that causal connection, the AC does not state a valid legal claim that the Defendants had any obligation to say these things.  *See Greenstone*, 779 F. Supp. 90-91; *Roeder*, 814 F.2d at 26.

In addition, absent a duty to do so based on their statements having addressed the subject, which they did not in these statements, the Defendants had no obligation to discuss their own or any government investigation, and the courts have repeatedly held that before such a duty arises, *there must be some nexus* between what the defendants stated and what the plaintiffs claim should have been disclosed.  *See Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc); *In re Praecis Pharms., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 22222, at * 11 (D. Mass. Mar. 28, 2007).  Here there was no such nexus; as a result these statements are not actionable.

**2.      The October 20, 2009 Investor Conference Call Statements**

As to the second occasion, the Amended Complaint alleges that during the October 20,

19

2009 conference call, Elliott, Leno, and Colen (the "Individual Defendants") made the following

series of statements regarding the Company's CRM Group business:

(a)      statements "blam[ing] the disappointing CRM growth in part on 150 newly hired
sales staff who were not 'up to speed' because, as Defendant Leno stated, their 'effectiveness in
the field will take longer than we had originally envisioned.'" AC at ¶ 18;

(b)      Elliott citing "'underexecution of the representatives' as was a reason why
delivering 'good numbers' was a 'tough go.'" AC at ¶ 18;

(c)      "Defendant Colen reiterate[ing] BSX's efforts to 'make these folks even more
productive moving forward.'" AC at ¶ 18;

(d)      Elliott emphasizing "our strong CRM product portfolio and sales in clinical
support team expansion efforts position us well on a going-forward basis." AC at ¶ 72;

(e)      Leno stating, "We continued to see solid growth in our CRM business in the
quarter although our growth is slower than we anticipated…. We delivered steady overall
constant currency CRM product growth of 8% in the third quarter revenues, with US defib sales
up 8% driven by our COGNIS and TELIGEN products …. This marks nine straight quarters of
CRM growth both US and worldwide." AC at ¶ 73; and

(f)      The Individual Defendants all making general comments about CRM being a
strong portfolio, having solid growth, being well positioned going forward, and noting their
expectation that BSC would continue to outperform the market and "take share." AC at ¶¶ 72-
78.

The Amended Complaint alleges that these statements were false and misleading because

they omitted the alleged material facts that: (1) the reported growth in CRM sales was inflated

and fueled by unethical sales practices within the CRM sales force; (2) the reported 8% growth

could not have been achieved without the repeated unethical conduct of certain CRM sales

personnel; (3) Defendants intended to take disciplinary actions against these repeat offenders,

including firing ten members of the CRM sales force at the end of November or first part of

December 2009; and (4) these terminations would result in the loss of substantial accounts.  AC

at ¶¶ 4, 5, 19, 20, 72, 75-77, 79-80.  As pointed out above, however, there are no particularized

factual allegations in Amended Complaint supporting these conclusions, and without such facts,

the Defendants obviously had no duty to make these statements.  *See Cambex*, 779 F. Supp. at

90-91; *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004); *Iron Workers Local v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 586 (E.D.VA 2006).

Moreover, the challenged statements themselves were quite general, and did not require any additional information to keep them from being incomplete and misleading.  For example, statements (a), (b), and (c) described above all relate to the poor performance of 150 newly hired sales personnel and the impact that these sales employees were having on CRM sales.  The fact that the Company was conducting an audit concerning certain food and entertainment expenses of twenty-one sales employees was not necessary to "make … complete and accurate" these statements relating to the ramping up of the 150 new employees.   *See In re Praecis Pharms., Inc.*, 2007 U.S. Dist. LEXIS 22222 at * 22.   Similarly, statements (d), (e), and (f) described above, suggesting that sales force productivity would improve going forward and that the company's strong product portfolio and sales well-positioned the company going forward, had nothing to do with the internal CRM Group investigation, and were the kind of "puffery" which is simply too general to be actionable in any event.[29]   *In re Allaire Corp. Sec. Litig.*, 224 F.Supp. 2d 319, 331 (D. Mass. 2002)(statement that product "exceeded our expectations" is "puffery").

---

[29]   *See Gross*, 93 F.3d at 995 (holding that the challenged statement "falls in the category of vague and loosely optimistic statements that this court has held nonactionable as a matter of law"); *Rosenbaum Capital LLC v. Boston Comm'n Group, Inc.*, 445 F. Supp. 2d 170, 176 (D. Mass. 2006) ("'[C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace - loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'") (*quoting Shaw Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)); *Fitzer v. Security Dynamics Techs.*, 119 F. Supp. 2d 12, 23 (D. Mass. 2000) (statement, "We're a company that has a strong and experienced management team that is well positioned  in dealing in this space …. " were non-actionable puffing); *Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 302 (D. Mass. 2004) (statement that "solid execution of our cost reduction programs and consistent focus on our key initiatives will position us for enhanced earnings potential once the economy improves" was puffery); *In re Cytyc Corp. Sec. Litig.*, 2005 U.S. Dis. LEXIS 6166, at *84-85, 91 (D. Mass. Mar. 1, 2005) (finding statements about the company's continuation of "momentum" and "consistent quarter to quarter growth," and a statement by the company's president and CEO that the company feels "confident in our success based on our track record" all non-actionable sales talk).

### 3.      The Form 10-Q filing on November 6, 2009

As to the third occasion, the Amended Complaint alleges that the statement in Boston

Scientific's Form 10-Q SEC filing on November 6, 2009, signed by defendant Leno, stating that

> On September 25, 2009 we received a subpoena from the U.S. Department
> of Health and Human Services, Office of Inspector General, requesting
> certain information relating to contributions made by CRM to charities
> with ties to physicians or their families.  We are currently working with
> the government to understand the scope of the subpoena …

was materially misleading where it said that the Company and Leno were making efforts to try

"to understand the scope of the subpoena" because Defendants did not simultaneously disclose

their pending internal investigation of CRM Group sales expenses and that BSC "maintained a

database containing investigations of ethical violations."  *See* AC at ¶ 82 (emphasis added).  As

the above-cited caselaw makes clear, however, Boston Scientific was not under any obligation to

disclose its ongoing internal audit, nor was such disclosure in any way "necessary to make the …

disclosure [about the HHS subpoena] complete and not misleading."[30]

The other challenged statement in this 10-Q is the statement that, "additional sales

representatives will generate incremental net sales in future periods," which the Amended

Complaint alleges was misleading because Boston Scientific failed to disclose that firing of sales

personnel would have a material impact on CRM sales in 2010 and beyond.  AC at ¶¶ 22-83.

There are no particularized facts that show that Boston Scientific knew at this point in time what

impact the later terminations of its sales employees would have on its earnings, however, and the

Company was not required to disclose its on-going internal investigation to make this statement

---

[30]   In fact, it is not pled that the HHS audit concerning "contributions made by CRM to charities with ties
to physicians or their families," AC at ¶ 81, bore any relation to "the audit [focusing] on the level of
food and entertainment expended on [certain] physician clients" in connection with "trips where sales
representatives accompanied physician clients to BSX manufacturing facilities in Minneapolis,
Minnesota, San Jose, California, and Puerto Rico for the purpose of education and learning" AC at ¶
13.  *See, e.g.*, *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 64 (D. Mass. 1998) ("None of the
four charged omissions is inherently related to or inconsistent with" the published statement.).

about additional sales representatives not misleading, and in any event, this statement itself is simply too general to be actionable under the securities laws.  *See* p. 21, Footnote 29, *supra*.

### 4.      The December 1, 2009 Piper Jaffray Healthcare Conference Call

As to the fourth occasion, the Amended Complaint alleges that the answer given by Elliott during the December 1, 2009 Piper Jaffray Healthcare Conference Call to the question of what surprised him "on the downside" since he became CEO, which was

> [B]ecause I've been here a bit as a director, there probably wasn't as many surprises really.  But I think the market change probably downward a bit on the ICD side affected sort of our viewpoint in CRM as a bit of a downside

*see* AC at ¶ 84, was "materially false and misleading" with respect to the portion that said "there were 'not as many surprises' other than the 'market change probably downward a bit on the ICD side'," AC at ¶ 85, because at that time he was allegedly concluding an investigation that resulted, ten days later, in the firing of ten CRM Group sales personnel, including one of three CRM Group Divisional Vice-Presidents.   Even assuming the decision to implement the dismissals had been made at that point, however, there was not a sufficient nexus between that action and the broad general comment that there "probably wasn't as many surprises" to render this comment materially misleading.  *See* Footnote 29, *supra*.

### 5.      The Form S-3 Registration Statement, Prospectus, and Supplement

As to the fifth occasion, the Amended Complaint alleges to be misleading a warning statement in Boston Scientific's Form S-3 Registration Statement and Prospectus, dated December 10, 2009, filed with the SEC on December 11, 2009, and then duplicated in a Supplement to that Prospectus filed on December 14, 2009, which stated that:

> Factors that could cause actual results to differ materially from those expressed in forward-looking statements are contained below and elsewhere in this prospectus supplement and the accompanying prospectus (including the documents incorporated by reference herein and therein)….

> Our ability to retain key members of our CRM sales force and other key personnel ….

*See, e.g.,* App. at Exh. 10, pp. 1365, 1371, 1417, 1423.  In the case of both the S-3 Statement and the Prospectus Supplement, the "risk factor" concerning Boston Scientific's ability to retain key personnel was one of fifty-one other generic risk factors listed.  While the AC asserts that this statement was misleading because it failed to disclose that the Company was about to terminate Douglas Nock ("Nock") and other key personnel, and that business would be lost as a result, AC at ¶¶ 27, 28, 87, 88, it cannot have been misleading to warn generally about a risk that existed.  The real issue is whether the Defendants had any obligation to disclose the specific CRM Group investigation or dismissals at that time.  As noted previously, they did not.  *See* pp. 13-17, *supra.*

### 6.    The January 12, 2010, JP Morgan Healthcare Conference Call

As to the sixth and final occasion, the Amended Complaint alleges that Elliott's statements that Boston Scientific had a "very very large stable … experienced … and very successful sales force," that the "sales execution that we talked about building in the last five or six months is now going out into play," and that "[w]e've already done a ton of work in the last six months to get rid of unnecessary distractions and litigation that goes beyond the norm," *see* AC at ¶ 90, were materially misleading because they did not disclose the December dismissals of 10 of the Company's CRM Group sales personnel, including a divisional vice-president.  *See* AC at ¶ 91.  These statements are alleged to be false and misleading because they omitted that Nock had been terminated and hired by St. Jude Medical on January 4, 2010, and that other sales representatives had been fired.  *See* AC at ¶¶ 30, 91.  All of these statements, however, were classic "puffery," and are simply too general to be actionable.  *See* Footnote 29, *supra.*

In short, as a matter of law, none of the statements made by the Defendants that are alleged in the Amended Complaint were materially misleading, and none of them created a duty

ME1 10989332v.5

on the part of the Defendants to disclose that which the Amended Complaint demands they should have disclosed.  For this most basic reason -- failure to plead actionable misstatements or omissions -- the Amended Complaint fails to state clams upon which relief may be granted.

## II.   THE AMENDED COMPLAINT FAILS TO PLEAD PARTICULARIZED FACTS SUFFICIENT TO CREATE THE REQUISITE STRONG INFERENCE OF SCIENTER ON THE PART OF ANY OF THE DEFENDANTS

The Amended Complaint also fails to plead particularized facts demonstrating that the Defendants acted with "scienter"[31] – *i.e.*, "that '[D]efendants consciously intended to defraud, or that they acted with a high degree of recklessness.'" *N.J. Carpenters Pension & Annuity Funds* v. *Biogen IDEC Inc.,* 537 F.3d 35, 44 (1st Cir. 2008) (quoting *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 82 (1st Cir. 2002)).  Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" *ACA Fin. Guar. Corp.*, 512 F.3d at 58 (lst Cir. 2008) (quoting *Ernst & Ernst* v. *Hochfelder,* 425 U.S. 185, 193 n.12 (1976)).  It requires a showing that a defendant acted with "either conscious intent to defraud or a high degree of recklessness." *Id.*[32]  In pleading scienter, "general averments of defendants' knowledge of material falsity" such as the ones that predominate the Amended Complaint "[d]o not suffice." *Gross*, 93 F.3d at 991.  Rather, a plaintiff must allege "with particularity" *specific facts* from which a *strong inference* of fraudulent intent can be drawn with respect to *each* act or omission alleged to be a violation of

---

[31]   The absence of any material omission (as discussed in the preceding section) strongly supports the finding that there is no scienter in this case.  *See In re Credit Suisse*, 431 F.3d 36, 53 (lst Cir. 2005) ("the plaintiffs' failure satisfactorily to plead subjective falsity also supplies a solid basis for a finding that they have failed to satisfy the PSLRA standard for pleading scienter."), *overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

[32]   The Amended Complaint pleads both actual knowledge and, in the alternative, "recklessness." Recklessness, however, requires pleading specific facts showing that "defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado v. Dominguez*, 137 F.3d 1, 9 n.4 (lst Cir. 1998).  Here, the opposite is true.  The timing of the disclosures in this case show that the Defendants waited only until they had sufficient knowledge to disclose the most pertinent information - the impact the terminations were estimated to have on CRM sales going forward - and timely disclosed that information as soon as reasonably practicable.

the securities laws.  15 U.S.C. § 78u-4(b)(2).[33]  *See also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 194 (lst Cir. 1999) ("the PSLRA . . . requires a complaint to 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'") (citation omitted).

The Supreme Court has held that in order to qualify as strong, "an inference of scienter *must be more than merely plausible or reasonable —* it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent*." *Tellabs,* 551 U.S. at 314 (emphasis added).  A merely "reasonable" inference is not enough, *Greebel*, 194 F.3d at 195, and any such inference must be sufficient to make it "highly likely" that the Defendants knowingly violated the securities laws.  *See Aldridge*, 284 F.3d at 82.  *Tellabs* further instructs that scienter must be evaluated with reference to the complaint as a whole rather than focusing on piecemeal allegations,[34] and competing inference should be weighed against plaintiffs' preferred interpretation of the facts.[35]  Also, a plaintiff cannot satisfy its burden to prove scienter by pleading, based on hindsight, that just because something went wrong the defendants must have known previously that it would.  *Gross*, 93 F.3d at 991; *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).

---

[33] To satisfy the scienter standard, "complaints typically identify internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time."  *In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d 43, 57 (D. Mass 1998) (citing *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 368 (lst Cir. 1994)).  The Amended Complaint fails to contain any such internal reports or memoranda.  At best, Plaintiffs cite to confidential witnesses who apparently committed unethical sales practices and were investigated and subsequently terminated.  None of their alleged "insider" information, however, advances the scienter analysis in the slightest.

[34] *Tellabs*, 551 U.S. at 323 ("The inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.")(emphasis added).

[35] *See ACA Fin. Guar. Corp.*, 512 F.3d at 59 ("*Tellabs* also affirms our view … that competing inferences should be weighed against plaintiffs' preferred interpretation of the facts.").

ME1 10989332v.5

### A.     The Allegations of Purported "Facts That Give Rise to a Cogent Inference of Scienter" Are Plainly Insufficient

In this regard, the Amended Complaint pleads a series of purported *"Facts That Give Rise to a Cogent Inference of Scienter," see* AC at ¶¶ 102-129, including:

A.     that net sales from BSC's CRM group was a material part of BSC's business, *id.*, ¶ 102 at pp. 35-36;

B.     that each Individual Defendant "focused" on the sales and performance of the CRM Group and "communicated" with investors about the CRM sales force, *id.*, ¶¶ 103-107 at pp. 36-37;

C.     that on December 11 or 12, 2009, Defendants fired Nock, a key employee, and that Nock began working for a competitor, St. Jude, on January 4, 2010, *id.*, ¶¶ 108-109 at p. 38;

D.     that in July 2009 BSC adopted the AdvaMed code of ethics and subsequently commenced, in August 2009, an audit of certain food and entertainment expenses of twenty-one CRM employees who took physician clients on trips to BSC facilities in Minneapolis, San Jose, and Puerto Rico, culminating in the firing of ten CRM employees in December 2009, *id.*, ¶¶ 110-114 at pp. 38-40;

E.     that Colen was involved with the expense report audits and terminations because he participated in the audit, *id.*, ¶¶ 115-116 at p. 40;

F.     that Elliott had knowledge of the terminations because he discussed them on February 11, 2010 (after they occurred), *id.*, ¶¶ 117-118 at pp. 40-41;

G.     that the Defendants had computerized access to sales data that allowed them to determine the financial impact of the termination of the ten CRM sales employees, *id.*, ¶¶ 105, 119-120 at pp. 37, 41-42;

H.     that BSC compiles a record of, and maintains a database of, investigations of unethical conduct, *id.*, ¶¶ 121, 125 at p. 42-43;

I.     that BSC was required to comply with, and certify its compliance with, various ethics codes, *id.*, ¶¶ 122-123 at pp. 42-43;

J.     that BSC "touted" its compliance with ethical codes, *id.*, ¶ 124 at p. 43;

K.     that BSC received the HHS Subpoena on September 25, 2009, which was a red flag that put Defendants on notice to investigate unethical contributions to doctors by CRM sales personnel, *id.* at ¶ 125 at p. 43, and that there were previous ethics violations by the CRM sales force when it was part of Guidant (as evidenced by a Department of Justice settlement announced on December 23, 2009), which was a further red flag to investigate unethical conduct, *id.*, ¶ 126 at pp. 43-44; and

L.     finally, that on December 10, 2009, BSC filed a Form S-3 Registration Statement and Prospectus announcing its intention to offer, and subsequent offering of, a total of $2 Billion in Senior Notes, said offering allegedly giving rise to Defendants' "motive to conceal" material facts as Defendants allegedly failed to disclose the ethics investigation and subsequent terminations "in order to offer the $2 Billion in Senior notes on terms more favorable to BSC than if the truth about CRM future sales and revenues had been known by investors." *Id.*, ¶¶ 128-129.

Even if the statements that the Defendants are alleged to have made were actionable, however (which they are not, *see* Part II, *supra*.), the above alleged "facts" would not be sufficient to create the requisite "strong" inference that any of the Defendants had the required intent to defraud at the time they made the challenged statements.

For example, the facts that, as alleged in item (A) above, the CRM Group net sales were a material part of BSC's business; and that, as alleged in item (B) above, the Defendants "focused" on the CRM Group sales; and that, as alleged in items (D), (I) and (J), in California and Massachusetts BSC was required to comply with ethics codes and adopted its own ethics code,[36] do not raise *any* inference of any knowing or reckless disclosure of materially misleading information.

Similarly, the facts that, as alleged in items (G) and (H) above, the Defendants as a group had access to a computerized database of sales force information allowing them to determine the potential impact of sales force departures, and compiled a database record of investigations of unethical conduct, do not raise any inference, let alone a strong inference, of fraudulent intent on the part of any of the Defendants) -- rather they raise an inference of responsible corporate governance.

---

[36] While the subheading on page 43 of the AC contains the argumentative assertion that the Company "touted" its adherence to ethical codes, the AC does not contain any particularized factual allegation that any of the Defendants made any specific false or misleading statement about the Company's adherence to ethics codes.

The fact that, as alleged in item (K), the Defendants had received notice of the HHS Subpoena, and were aware of the settlement of a prior Government investigation of prior ethical violations by the CRM Group sales force, also raises no "strong" inference of fraudulent intent on the part of the Defendants, despite the AC's conclusory and argumentative characterization of it as a "red flag."

Similarly, the allegation in item (L) above, that BSC filed a form S-3 Registration Statement on December 10, 2009 announcing its intent to offer $2 billion in senior notes, and that the Defendants supposedly had a motive to conceal the CRM Group dismissals and employee ethics violations "in order to offer $2 billion in Senior Notes on terms more favorable to Boston Scientific than if the truth about CRM future sales and revenues had been known by investors," AC at ¶ 129, also fails to raise the requisite "strong" inference of fraudulent intent on the part of the Defendants, because (a) it is well-settled that evidence of a *motive* to defraud is not the same as evidence of *intent* to defraud,[37] and (b) in the absence of particularized allegations of a concrete financial interest in the deal, courts have repeatedly rejected the theory that the mere existence of an upcoming corporate transaction creates the requisite inference of scienter.[38]  Clearly, much more is required to show fraudulent intent than is pled in the AC.

Item (D) above, for example, claims that the Company began the CRM Group internal investigation in August of 2009, and that confidential witnesses 1 and 2 were interviewed as part of that process, and then were told that they would be advised later as to its results.  This, too, is

---

[37]   *Meyer v. Biopure Corp.*, 221 F. Supp. 2d 195, 209 (D. Mass. 2002) ("While these facts may establish a motive, evidence of motive and opportunity is not enough to create a blanket presumption that any omissions were made with intent to defraud; there must be some other indication of knowledge or a high degree of recklessness with respect to each act or omission, which is not pleaded here."); *Bielski v. Cabletron Sys. (In Re Cabletron Sys.)*, 311 F.3d 11, 39 (1st Cir. 2002) ("'catch-all allegations' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA.").

[38]   *See* pp. 5-6, *supra* (Footnote 15 and accompanying text), and cases cited therein.

insufficient to create the requisite "strong inference" of fraudulent intent on the part of the Defendants because the fact "[t]hat defendants may have known enough to 'commence' an investigation is not enough to prove that defendants had intent to deceive." *See Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 800 (N.D. Ill. 2007).

In addition, although the AC makes several allegations about BSC's actions in the Fall of 2009 based on information that it claims was supplied to Plaintiffs' counsel by two so-called "confidential witnesses," CW1 and CW2, *see* AC at ¶¶ 12-15, 23, 25, 28, 30, 110-113, 115, there is no allegation that either witness had personal knowledge concerning the details of the relevant audit investigation, the purposes of the executives conducting it, or the intent of the Defendants concerning it, and in this situation, the federal courts have repeatedly held that information from "confidential witnesses" is insufficient to support a pleading of scienter unless the witnesses are specifically alleged to have had personal knowledge of the relevant decision making process, and the actual intent of the relevant decisionmakers. *See Malin v. XL Capital Ltd.,* 499 F. Supp. 2d 117, 138 (D. Conn. 2007), *aff'd,* 312 Fed. Appx. 400 (2d Cir. 2009); *Shurkin v. Golden State Vintners, Inc.*, 471 F. Supp. 2d 998, 1016-1017 (N.D. Cal. 2006), *aff'd,* 303 Fed. Appx. 431 (9th Cir. 2008); *Zucco Partners, LLC v. Digimare Corp.,* 445 F. Supp. 2d 1201, 1204 (D. Or. 2006), *aff'd,* 552 F.2d 981 (9th Cir. 2009).  Here there are no such allegations.

Finally, the claims in the AC as to the Individual Defendants alleged in items (C), (E), and (F) above -- that they knew about and/or were involved in the dismissals of the CRM Group sales personnel in 2009 -- are also insufficient to raise the requisite "strong inference" of fraudulent intent on the part of the Individual Defendants,[39] because, as set forth above, those

---

[39] As for the fact that the loss of key employees, such as Nock, might impact CRM sales if these employees went to work for a competitor, BSC could not have known where these employees were going to work until after they were terminated, and Defendants are not alleged to have known that Nock was going to go work for St. Jude until January 4, 2010.

individuals had no duty to immediately disclose what they knew about this situation, and in fact had a responsibility not to make any statements about it until an accurate assessment of the impact of these events could be made.

### B. There Are More Plausible, Non-Culpable Explanations For The Defendants Not Immediately Discussing The CRM Group Investigations and Dismissals

According to the Amended Complaint, BSC commenced its ethics audit in August 2009 and it involved twenty-one employees.  The mere fact that an investigation is "commenced" is not sufficiently material to merit any type of disclosure, particularly since the outcome - and impact - of the investigation is not yet known, and thus the failure to disclose this fact is insufficient to evidence scienter.  *See Roth*, 527 F. Supp. 2d at 800 ("That defendants may have known enough to 'commence' an investigation is not enough to prove that defendants had intent to deceive.").  Subsequently, the audit is alleged to have continued for several months, culminating in the termination of ten employees in December 2009, several of whom went to work for a competitor in January 2010.  In early February 2010, the Defendants reported on their assessment of the impact of these events.

These facts, taken in their entirety, not only fail to support an inference of fraudulent intent, they demonstrate an effort by Boston Scientific to investigate the facts fully, digest the results, and then promptly disclose their assessment of the impact of these employee terminations.  This is consistent with the requirements of the securities laws; it is not evidence of an intent to defraud.  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. at 217 ("[d]efendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate response before a duty to disclose arises.").  Plaintiffs' implicit standard of immediate disclosure of any and all information is neither required nor favored by the law, and

would be impractical.[40]   *See Horizon Asset Mgmt. v. H&R Block, Inc.*, 580 F.3d 755, 763 (8th Cir. 2009) (holding that instituting prompt internal investigation …"was a prudent course of action that weakens rather than strengthens an inference of scienter").   On February 11, 2010, Boston Scientific did in fact timely disclose the results of its internal audit once sufficient facts concerning who would be terminated and how it could impact the Company were developed. This was only two months after any CRM employees were actually terminated and only a month after they learned that Nock would go work for a competitor.   The only sensible inference that can be drawn from these facts is that the Defendants acted appropriately and timely and without recklessness or a deliberate intent to mislead.   *See*, *e.g.*, *Slayton v. American Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("[r]ather than suggesting an intent to deceive investors, the facts contained in … article exhibit the defendants engaging in a good-faith process to inform themselves and the public of the risks"); *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 2010 U.S. Dist. LEXIS 21096, at *21-22 (E.D. Mo. Mar. 8, 2010).

### C.   The Allegations in the Amended Complaint Are Insufficient to Create the Requisite "Strong" Inference of Scienter as to Any of the Individual Defendants

Examining the allegations of scienter in the Amended Complaint as to each of the Individual Defendants leads to the same conclusion, namely that particularized allegations to create the requisite "strong inference" of scienter are sorely lacking.

### 1.   Allegations of Scienter as to Fredericus A. Colen

Colen is currently Executive Vice President and Chief Technology Officer of BSC.  Prior to February of 2010, he was Executive Vice-President and Group President of the CRM Group.

---

[40]   The low standard of disclosure urged by Plaintiffs would cause companies to "deluge investors with marginally useful information, and . . . damage corporations' legitimate needs to keep some information non-public'" for fear of being second-guessed in a subsequent disclosure suit. *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008) (citation omitted).

He is mentioned in the same few allegations of the AC that are repeated many times.  *See* AC ¶¶ 1, 18, 25, 34, 44, 72, 76, 78-80, 89, 102, 107, 113, 114-155.   In substance, the Amended Complaint alleges that Colen "made false and misleading statements during a Boston Scientific conference call with analysts on October 20,2009," and "participated directly in the sales executive firings on December 9, 2009." AC at ¶¶ 89, 111.  In the call, Colen allegedly reiterated Boston Scientific's effort to "make these folks [salespersons] even more productive moving forward,"  AC ¶ 18, and further reiterated Boston Scientific's increasing CRM market share and the "positive but mixed" outlook for market growth going forward.  AC ¶ 76.  None of these statements were false, and none evidence any kind of fraudulent intent.

### 2.    Allegations of Scienter as to Sam R. Leno

Leno was Executive Vice President of Financial and Information Systems and CFO of Boston Scientific from 2007 until promoted to Executive Vice President and Chief Operating Officer on March 1, 2010.  Leno's comments that are identified in the AC were only made on October 20, 2009.  There are also references to a statements made in the 10-Q filed on November 6, 2009, which Leno signed.  The Plaintiffs allege that Leno, in addition to Elliott and Colen, made remarks on conference calls that were materially false and misleading, but careful review of his statements does not bear out that claim, and the AC offers no particularized allegations as to his fraudulent intent.

### 3.    Allegations of Scienter as to J. Raymond Elliott

Elliott was a Director of Boston Scientific from September of 2007 to June of 2009, and has been President and CEO of Boston Scientific since July 13, 2009.  The same allegations made against Colen and Leno have been made against Elliott.  The Plaintiffs also allege that Elliott misrepresented material facts when he was asked whether there were any surprises when

33

he took over as CEO.  Elliott's comment, however, was simply that he was not surprised.  That statem ent, as a matter of law, was not a material misrepresentation.  *See* Footnote 29, *supra*.

Nevertheless, in an effort to plead scienter as to Elliott, the AC alleges in ¶ 96 that Elliott "acknowledged his direct involvement in the disciplinary process" involving the CRM personnel supposedly by "admitting his role in 'kicking their tires' repeatedly," referring to the disciplined sales personnel, but the transcript of the conference call reveals that Elliott's reference to his "kicking the tires" (not "kicking their tires") had nothing to do with the December 2009 dismissals, and was mentioned by him two questions later in response to a question about when the market would see "the quantifiable benefits" of his "strategy plan" for the Company.  *See* App. at Exh. 3, pp. 1777-1778.  Put simply, the AC pleads no particularized facts that, if true, would support any inference of scienter as to Elliott.

## III.  THE AMENDED COMPLAINT DOES NOT ADEQUATELY PLEAD LOSS CAUSATION

The Amended Complaint also fails to adequately plead loss causation.  In reaffirming that proof of loss causation is a key element of a Section 10(b) claim, the Supreme Court noted that the private right of action under section 10(b) is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  To sufficiently allege that their loss was proximately caused by a material misrepresentation or omission, therefore, a plaintiff must plead "a causal connection between the material misrepresentation and the loss."  *Id.* at 342.  It is not enough merely to allege that shares were purchased at an inflated price.  *Id.*

It is also well-settled that "loss resulting from the materialization of a *disclosed* risk does not support a claim of securities fraud."  *See In re Boston Sci. Corp. Sec. Litig.*, 490 F. Supp. 2d 142, 154 (D. Mass. 2007)(emphasis added), *rev'd on other grounds*, 523 F.3d 75 (1st Cir. 2008).

34

A plaintiff must allege "both that the loss be foreseeable *and* that the loss be caused by the materialization of the *concealed* risk." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2nd Cir. 2005)(emphasis added).   Plaintiffs cannot do so here, because the risk of BSC sales personnel leaving that caused the claimed loss were disclosed in all of the Company's previous public filings and were well known to the market.   *See* App. at Exh. 10.   The risk that ultimately materialized was not, therefore, a "concealed risk" that caused the Plaintiff's loss. *See In re Alkermes Sec. Litig.*, 2005 U.S. Dist. LEXIS 25826, at \*36 (D. Mass. October 5, 2005).

## IV.   THE AMENDED COMPLAINT DOES NOT ADEQUATELY PLEAD A VIOLATION OF SECTION 20(A)

Finally, since a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded, *In re Parametric Tech. Corp. Sec. Litig.*, 300 F. Supp. 2d 206, 224 (D. Mass. 2001), the AC here fails to state a § 20(a) claim.   It also fails to allege a violation of Section 20(a) because Plaintiffs have not adequately pled "culpable participa[tion]" by the Individual Defendants (*i.e.*, that the Individual Defendants knowingly, actively, or meaningfully participated in making any material misstatement with actual knowledge of its falsity).   *See SEC v. First Jersey Sec., Inc.* 101 F.3d 1450, 1472 (2d Cir. 1996).[41]

## CONCLUSION

For all of the foregoing reasons, the Defendants' Motion to Dismiss should be granted, and the Amended Class Action Complaint dismissed with prejudice.

---

[41]   The First Circuit has not addressed whether "culpable participation" is an element of a Section 20(a) claim.   *See Brody v. Stone & Webster, Inc. (In re Stone & Webster, Inc., Sec. Litig.*), 414 F.3d 187, 196 n.6 (1st Cir. 2005) ("this Circuit has taken no position on the question whether a plaintiff must prove 'culpable participation' on the part of the defendant in order to prevail under § 20(a)").   Nevertheless, several courts have held that it is, *see, e.g., SEC v. First Jersey Sec., Inc.*, 101 F.3d at 1472; *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir. 1981).   **But see** *In re Brooks Automation Inc. Secs. Litig.*, 2007 U.S. Dist. LEXIS 88045, at \*43-45 (D. Mass. Nov. 6, 2007) (holding that "culpable participation" is not an element of a § 20(a) claim).

Respectfully submitted,

BOSTON SCIENTIFIC CORPORATION, J.
RAYMOND ELLIOTT, JAMES R. TOBIN,
And SAMUEL R. LENO,

By their attorneys,

/s/Robert J.Kaler

_____

Robert J. Kaler, BBO #542040
  rkaler@mccarter.com
Edward W. Little, Jr., BBO #628985
  elittle@mccarter.com
David Himelfarb, BBO #649596
  dhimelfarb@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA 02110
Tel. (617) 449-6500
Fax (617) 607-9200

Dated:  December 17, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served by hand on local counsel for the plaintiffs, and all counsel of record via electronic mail.

By:     /s/Robert J. Kaler          

Date:   December 17, 2010

36