UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                  )
IN RE BOSTON SCIENTIFIC CORPORATION  )
SECURITIES LITIGATION             )
                                  )     CIVIL ACTION NO.
                                  )     10-10593-DPW
                                  )
                                  )
```

MEMORANDUM AND ORDER
September 19, 2011

This putative securities fraud class action was brought by
Steelworkers Pension Trust ("Steelworkers") and KBC Asset
Management NV ("KBC") (collectively, the "Plaintiffs") against
Boston Scientific Corporation ("Boston Scientific" or the
"Company"), a publicly traded manufacturer of medical devices,
and several of its executives[1] (collectively, the "Defendants").
According to Plaintiffs, Boston Scientific made several
misrepresentations or omitted to disclose information regarding

---

[1] The text of the Amended Complaint names as individual
defendants J. Raymond Elliott, President and Chief Executive
Officer, Sam R. Leno, Executive Vice President of Financial and
Information Systems and Chief Financial Officer, and Fredericus
A. Colen, Executive Vice President and Group President of the
cardiac rhythm management ("CRM") group.  (Am. Compl. ¶¶ 1, 42-
44.)  The caption of the complaint mentions James R. Tobin,
former President and Chief Operating Officer of Boston
Scientific, as one of the defendants, but fails to name Defendant
Colen.  A motion to correct the caption to read "In re Boston
Scientific Corp. Securities Litigation" was later filed and
granted, but it did not address the absence of actual allegations
against Defendant Tobin.  Because no allegations are made in the
complaint against Defendant Tobin, the motion to dismiss may be
allowed as to him without further analysis of his role.  I will,
however, consider the allegations in the complaint as to
Defendant Colen, despite his absence from the original caption.

unlawful sales practices and subsequent dismissals within its cardiac rhythm management ("CRM") sales group, thereby leading to artificial inflation of the Company's stock in violation of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  The alleged class consists of all persons or entities who purchased common stock of Boston Scientific from October 20, 2009 to February 10, 2010 (the "Class Period").  Defendants have moved to dismiss the complaint.  For the reasons discussed below, I will grant Defendants' motion.

## I.   BACKGROUND

### A.   *Factual Background*

In reciting the facts as alleged, all reasonable inferences are drawn in favor of Plaintiffs.

### 1.   The Importance of CMR Sales and Sales Representatives for the Company's Overall Performance

Boston Scientific manufactures and distributes CMR devices, such as pacemakers, implantable cardioverter defibrillators, and cardiac resynchronization therapy defribrillators.  (Am. Compl. ¶¶ 7, 46.)  CRM devices are ordinarily used to treat improperly-beating hearts and other cardiac disease.  (*Id.* ¶ 46.)  The Company entered the CMR market when it acquired Guidant Corporation in April 2006.  (*Id.* ¶ 7.)  The sale of CMR devices soon became a significant source of the Company's consolidated net sales, amounting to approximately 30 percent for the third

quarters of 2008 and 2009.  (*Id.* ¶¶ 46, 102.)  For this reason, any "increases or decreases in [its] CRM Group net sales could have a significant impact on [its] results of operations." (*Id.* ¶ 102.)

Because CRM devices involve a complex technology, the quality of the sales force is "crucial" to the Company's performance in this field.  (*Id.* ¶ 9.)  CRM sales personnel are expected not only to be skilled salesmen, but also to have acquired significant technical and clinical knowledge.  (*Id.* ¶ 47.)  This knowledge must enable CRM sales personnel to provide assistance to physicians during the implantation process, as well as follow-up visits with patients.  (*Id.*)  Due to this close collaboration, the relationship between sales representatives and physicians often grows so strong that, when a sales representative decides to work for a competitor, his accounts can be expected to follow that representative.  (*Id.* ¶ 9.)

 2.  <u>The Ethical Rules Applicable to the Company</u>

Because of the risks associated with the sale of products in the healthcare arena - particularly that of improperly influencing the purchasing decisions of healthcare professionals - the environment in which Boston Scientific operates requires strict adherence to regulations, as well as to other ethical guidelines.  For its part, the Company's Corporate Code of Conduct mandates that "[a]ll gifts, payments, and business

3

courtesies, including meals must [c]omply with legal requirements, generally accepted ethics, and the standards of the recipient's organization," "[c]omply with all company policies that apply to [the] location," and "[b]e consistent with Boston Scientific's commitment to integrity." (*Id.* ¶ 59.)

Moreover, the Code of Ethics established in July 2009 by the Advanced Medical Technology Association ("AdvaMed"), the governing body of the medical device industry, prohibits the Company from interfering "with a Health Care Professional's independent clinical decision making or provid[ing] coverage, reimbursement and health economics support as an unlawful inducement." (*Id.* ¶¶ 60, 62.) The AdvaMed Code of Ethics also prohibits "grants or donations as an unlawful inducement" and mandates the Company to "ensure the bona fide nature of the charitable organization or charitable mission." (*Id.* ¶ 62.)

In addition to adhering to internal and professional guidelines, Boston Scientific is required to comply with the ethical guidelines set forth in various state regulations. (*Id.* ¶ 63.) In this regard, the Company certified its compliance with the California Comprehensive Compliance Program on July 1, 2010, stating that the Company "promptly investigates and responds appropriately to any violations consistent with [its] policies addressing noncompliance and misconduct." (*Id.*)

3.   The Internal Audit and Disciplinary Measures Taken by the Company Against Certain CRM Sales Personnel

In August 2009, about one month after the AdvaMed Code of Ethics became effective, the Company began an audit of CRM sales expense reports, according to a confidential witness ("CW2"). (*Id.* ¶ 111.)  The purpose of this audit was, according to another confidential witness ("CW1"), to review the expenses incurred for food and entertainment provided to physicians during trips to certain of Boston Scientific's manufacturing facilities, and to determine whether these expenses complied with ethical guidelines.  (*Id.*)  Following this audit, twenty-one members of the CRM sales force, including CW2, were interrogated by the Company from the end of August through the first week of September 2009.  (*Id.* ¶ 112.)

During the period from December 9 through December 12, 2009, Defendant Colen and Jean F. Lance, Chief Compliance Officer, terminated several members of the CRM sales force, including CW2, for violation of the Company's ethical policies.  (*Id.* ¶¶ 108, 113.)  Among the sales personnel terminated during that time period[2] was Douglas Nock, one of the three Division Vice Presidents for CRM sales.[3]  (*Id.* ¶ 108.)  Nock was then hired by

---

[2]  The complaint alleges that Nock was terminated on "December 11 or 12, 2009."  (*Id.* ¶ 108.)

[3]  Boston Scientific's CRM market is divided for sales and administrative purposes into three "divisions," each of them being supervised by one Division Vice President for CRM sales.

a competitor, St. Jude Medical, where he began working on January 4, 2010. (*Id.*) Defendants did not disclose publicly the existence of the internal audit and the resulting dismissal of certain CRM sales personnel until the close of trading on February 10, 2010.

> ### 4.   The Alleged Misleading Statements or Omissions During the Class Period

On October 20, 2009, the first day of the Class Period, Boston Scientific filed a Form 8-K with the Securities Exchange Commission, announcing its results for the third quarter of 2009. (*Id.* ¶ 70.) In the press release attached to the Form 8-K, the Company reported an "[i]ncreased worldwide cardiac rhythm management (CRM) product sales [of] eight percent," while indicating that "CRM market growth ha[d] not been as strong as expected." (*Id.* ¶¶ 70-71.)

On that same day, Defendants Elliott, Leno, and Colen conducted a conference call with investors and analysts to discuss the Company's performance. (*Id.* ¶ 72.) During this call, Defendant Elliott observed that, while the Company would "continue to take share" in the CRM market, the "under execution" of newly-hired sales representatives had brought its CRM revenues "back down." (*Id.* ¶ 77.) Along the same lines, Defendant Leno

---

(*Id.* ¶ 48.) These divisions are, in turn, broken down into several "areas," with each area having one Area Vice President. (*Id.*) These areas are themselves divided into smaller "regions," with each region having one Regional Sales Manager. (*Id.*)

recognized that the Company's growth had been "lower than expected" because it had "underestimate[d] the length of time it would take these newly trained reps to become productive." (*Id.* ¶ 75.) This factor would, in Leno's view, cause the Company "to fall short of [its] original expectations in the last half of [2009]." (*Id.*)  For his part, Defendant Colen underlined the Company's increasing market share, while noting a "positive but mixed" outlook for market growth expectations due to newly-hired CRM sales representatives. (*Id.* ¶¶ 76, 78.)

Less than a month later, on November 6, 2009, the Company filed its quarterly report (Form 10-Q) with the SEC. (*Id.* ¶ 81.) In this report, the Company stated that it had received, on September 25, 2009, a subpoena from the U.S. Department of Health and Human Services (the "DHHS Subpoena") "requesting certain information relating to contributions made by CRM to charities with ties to physicians or their families," and indicated that it was "currently working with the government to understand the scope of the subpoena." (*Id.*)  The Company also suggested in this report that "additional sales representatives w[ould] generate incremental net sales in future periods." (*Id.* ¶ 83.)

Following the Form 10-Q filing, Defendants Elliott and Leno participated in a Piper Jaffray Healthcare Conference Call with analysts on December 1, 2009. (*Id.* ¶ 84.)  During this call, the moderator asked Defendant Elliott what had surprised him on the

downside when he became Chief Executive Officer in July 2009. (*Id.*)  In response, Defendant Elliott replied that "there probably wasn't as many surprises really," while observing that "the market change probably downward a bit on the ICD [implantable cardioverter defibrillator] side affected sort of [his] viewpoint in CRM as a bit of a downside."  (*Id.*)

Shortly thereafter, on December 10, 2009, Boston Scientific filed a Form S-3 Registration Statement and Prospectus with the SEC, announcing the pricing of a public offering for $2 billion aggregate principal amount of its Senior Notes.[4]  (*Id.* ¶ 87.) The Company then filed a Supplement to the Prospectus on December 14, 2009,[5] the day the offering was to close.  (*Id.*)  Both the Prospectus and the Supplement listed the Company's "ability to retain key members of [its] CRM sales force and other key personnel," as one of fifty one factors that could potentially cause actual results to differ materially from forward-looking statements.  (*Id.*)

Following the filing of the Form S-3, Defendants Elliott and Leno participated in a JP Morgan Healthcare Conference on January 12, 2010 to discuss the Company's overall performance and future

_____

[4]  Senior notes (or senior debts) are securities that take priority over other unsecured debts of the issuer.

[5]  The complaint states that, although the Supplement was filed on December 14, 2009, the document was dated December 10, and that its filing date was later changed to December 11, 2009. (*Id.* ¶ 87.)

prospects.  (*Id.* ¶ 90.)  During that conference, Defendant Elliott stated that the Company had done "very, very well at taking share" in virtually all categories thanks to a "stable, large, experienced" and "very successful sales force."  (*Id.*)  He also observed that the Company had "done a ton of work in the last six months to get rid of unnecessary distractions and litigation."  (*Id.*)  The Company's stock was valued at $9.79 per share on January 20, 2010.  (*Id.* ¶ 131.)

    5.  <u>The Defendants' Statements After the Class Period</u>

After the close of trading on February 10, 2010, the last day of the Class Period, Boston Scientific issued press releases announcing its results for the fourth quarter of 2009, as well as certain management changes and restructuring initiatives.  (*Id.* ¶ 92.)  The press releases were followed by a conference call with analysts on February 11, 2010 before opening of trading.  (*Id.*)

After having made the customary "Safe Harbor Statement,"[6] Defendant Elliott discussed "the likes, dislikes, and hot topics" for the fourth quarter of 2009 and mentioned the disciplinary measures taken against some of the CRM sales forces, as well as the effect of these measures:

    Dislikes. Now let's take a look at what we didn't like.

---

[6]  *See* Defs.' App. Ex. 3, at 1726 ("Before we begin I'd like to remind everyone of our Safe Harbor Statement. This call contains forward-looking statements. The Company wishes to caution the listeners that actual results may differ from those discussed in forward-looking statements").

Number one, **we didn't like how we got to the fourth quarter earnings. To quote the old street phrase, "we got there ugly" but better on the number than under it. We didn't like our gross margins** which fell for the second straight quarter although a large majority of the drop is due to two non-recurring events, the CRM advisory and third party sourcing agreement.

Gross margins remain an area of concern and intense focus. . . . However, we expect to see these lower levels of gross margin throughout 2010 as we rebuild the business.

. . . .

Number three, we didn't like the response of St. Jude Medical to the disciplinary actions we took during December. **We exited from our Company several sales representatives and Managers who among other things repeatedly breached our healthcare professional Code of Conduct.** St. Jude has chosen to quickly hire many of our departed staff, we have invested heavily in building our HCP program under our new Chief Compliance Officer, Jean Lance. . . .

**. . . . In the short haul, we will for certain lose sales**, but I believe in the long haul we will be held in high regard by those that count for our efforts in the healthcare professionals arena. Others may not be so fortunate.

(*Id.* ¶ 93; Def.'s App. Ex. 3, at 1739 (emphasis added).)

Defendant Elliott also acknowledged his involvement in the termination of sales representatives and reported that this process was completed "before Christmas" of 2009. (Am. Compl. ¶ 96.)

The estimated loss to the Company's revenues amounted, according to Defendant Elliot, to $100 million due to the expectation that the sales representatives would "take business with them:"

> The nature of this business, the CRM side, is fairly sticky, and I think **we recognized the fact that in making those choices, you choose to lose sales along the way because reps will take business with them.** So, I think we've tried to put back into our guidance, rather than try to have to explain halfway through the year some of the sales circumstances, we're doing it upfront now. . . . . I know people may feel we're throwing the sink at this. That is not true. We're simply trying to get a[n] early communication to you to the relevant things in our business. And this is relevant . . . to the tune **we believe of $100 million**. . . .

(*Id.* ¶ 97 (emphasis added).)  During the same call, Jeff Capello, the Chief Accounting Officer, explained that this loss was not only attributable to the disciplinary actions taken against CRM sales personnel, but also resulted from the recent product advisory of certain of the Company's subpectoral defibrillator products.[7]  (Defs.' App. at Ex. 3, at 1742-43.)  On February 11, Boston Scientific stock fell from $8.29 to $7.47, approximately a 10% drop on a heavy volume of 154,096,124 shares traded, compared with 23,735,031 shares traded on February 10.  (Am. Compl. ¶ 136.)

Market professionals promptly relayed the Company's announcements on February 11 and February 12, 2010.  For instance, Deutsche Bank reported that the impact of the product advisory *and* the termination of some CRM sales personnel, may

---

[7] A "subpectoral defibrillator" is designed to be implanted under the pectoral muscle.  The Company issued, on December 1, 2009, a product advisory, advising physicians not to implant certain subpectoral defibrillators until further improvements were made and to impose frequent check-ups for patients with such devices.

"potentially be in the $100 million range." (*Id.* ¶ 138.)  Credit
Suisse went even further indicating that it did "not believe the
shares [we]re attractive at current levels" in light of the "host
of challenges" that the Company was facing at the time:

> Boston Scientific's earnings have been flat for the past
> three years and are expected to decline next year as the
> company faces a host of challenges.  The fundamentals
> continue to deteriorate and earnings revisions continue
> to be negative.  The company is heavily weighted to the
> coronary stent and [CRM] markets, two markets that we do
> not find to be particularly attractive at the present
> time.  Moreover, Boston Scientific's positions within
> these markets are challenged.  In coronary stents, the
> company is facing an adverse mix shift from TAXUS to
> PROMUS, which is half as profitable. . . .  In [CRM], the
> company gained share in 2009 however it now appears that
> such share gains may have been helped by questionable
> sales practices.  Boston Scientific indicated it let go
> some CRM personnel due to noncompliance with the
> company's ethic policy.  Boston Scientific also issued a
> CRM product advisory in December.  The combination of the
> disciplinary actions and the product advisory may cost
> the company, by its own estimates, $100 million in
> revenues in 2010.  All things considered, we do not
> believe the shares are attractive at current levels.

(Defs.' App. Ex. 6, at 4.)

Approximately two months later, on April 27, 2010, the
Company reported that the disciplinary actions would have a
greater impact than expected on its 2010 revenues, estimating
that the total loss would amount to an additional $300 million.
(Am. Compl. ¶ 99.)  The Company conceded in a letter sent to the
SEC on May 21, 2010, that it expected "to experience the impact
of these terminations during 2010" and that it intended "to
replace these positions throughout 2010 and recapture lost

revenue in 2011 and beyond." (Defs. App. Ex. 7, at 3.) In this letter, Boston Scientific stated that the "terminations of 10 sales personnel represented less than one percent of [the Company's] U.S. CRM sales force and had an immaterial impact on [its] net sales during the fourth quarter of 2009." (*Id.*) The Company nevertheless assured that "[i]n future filings, to the extent [its] businesses experience significant changes in revenues from period to period," it would "discuss all material factors contributing to these changes." (*Id.*) The Company's stock reached a low of $5.33 per share on September 10, 2010. (Am. Compl. ¶ 136.)

## B.   *Procedural Background*

Plaintiff City of Roseville Employees' Retirement System ("Roseville") initially commenced the instant action on April 9, 2010. Two months later, on June 8, 2010, four separate motions for appointment as lead plaintiff and approval of selection of lead plaintiff counsel were filed by Steelworkers, KBC, Iron Workers Locals 40, 361, 417 Union Security Funds ("Iron Workers"), and Roseville. Each of the movants claimed having suffered loss from the purchase of Boston Scientific stock during the Class Period in the amount of $1,846,129 for KBC, $1,049,944 for Steelworkers, $189,457 for Iron Workers, and $5,416 for Roseville.

Shortly thereafter, on June 21, 2010, Roseville filed a notice of withdrawal of its motion for appointment. Recognizing that they had incurred the largest losses, KBC and Steelworkers moved, on June 22, 2010, for appointment as co-lead plaintiffs and approval of their selection of co-lead counsel. This motion was unopposed by Iron Workers, the only remaining movant. Judge Saris, who was assigned initially to this matter, issued a stipulation and order on July 13, 2010, approving the KBC/Steelworkers motion for appointment as co-lead plaintiffs and their selection of co-lead counsel.

Following that order, Plaintiffs KBC and Steelworkers filed a two-count Amended Class Action Complaint on September 14, 2010, asserting violation of Section 10(b) (Count I) and Section 20(a) (Count II) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b. The matter was reassigned to me on February 25, 2011, shortly after Defendants had moved to dismiss the complaint in its entirety.

## II.  DISCUSSION

The crux of Plaintiffs' case rests on the allegation that Defendants knowingly or recklessly made false statements or omitted to disclose material information related to questionable sales practices within the CRM sales force, thereby causing members of the class to purchase the Company's stock at an artificially inflated price.

14

### A.   *Section 10(b) and Rule 10b-5 (Count I)*

Plaintiffs have made allegations against Defendants under Section 10(b) of the Securities Exchange Act and Rule 10b-5. (Am. Compl. ¶¶ 154-58.)  Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5 implements this section by prohibiting to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.

To prevail on Section 10(b) claim, a plaintiff must show six elements: "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  *Miss. Pub. Emps. Ret. Sys. v. Boston Scientific, Corp.*, No. 10-1663, --- F.3d ----, 2011 WL 3558203, at *12 (1st Cir. Aug. 4, 2011) (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 756 (1st Cir. 2011)).

1.   <u>Pleading Requirements</u>

When assessing the merits of a Rule 12(b)(6) motion, a court must "accept as true all well-pleaded facts set out in the complaint and indulge all reasonable inferences in favor of the pleader." *S.E.C. v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) (en banc).  While "detailed factual allegations" are not ordinarily required, a complaint must nonetheless "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility requires the plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (quoting *Twombly*, 550 U.S. at 556).

Securities fraud allegations must also meet the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b)[8] and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-21 (2007).  When allegations of material misrepresentations or omissions are made, the PSLRA requires that the complaint "specify each

---

[8]  Federal Rule of Civil Procedure 9(b) requires that, in alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).

statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).

The PSLRA also imposes a heightened standard for allegations of scienter.  Scienter is defined as the "mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  To satisfy this requirement, a plaintiff must show that "defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 44 (1st Cir. 2008) (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002)).  Recklessness in this context refers to "a highly unreasonable omission, involving not merely simple, or even inexcusable[] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Boston Scientific*, --- F.3d ----, 2011 WL 3558203, at *12 (quoting *SEC v. Fife*, 311 F.3d 1, 9-10 (1st Cir. 2002)) (alteration in original).

Specifically, the PSLRA requires that the complaint "with respect to each act or omission, . . . state with particularity facts giving rise to a strong inference that the defendant acted

with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  A
strong inference means that the inference "must be more than
merely plausible or reasonable - it must be cogent and at least
as compelling as any opposing inference of non-fraudulent
intent."  *Tellabs*, 551 U.S. at 314.  Phrased differently, the
PSLRA requires "a significant amount of 'meat' . . . on the
'bones' of the complaint."  *Hill v. Gozani*, 638 F.3d 40, 56 (1st
Cir. 2011) (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512
F.3d 46, 63 (1st Cir. 2008)).

Scienter allegations must be examined "with reference to the
complaint as a whole, rather than to piecemeal allegations."
*ACA Fin.*, 512 F.3d at 59.  The court must weigh "competing
inferences . . . against plaintiffs' preferred interpretation of
the facts."  *Id*.  This means that the court must conduct a
"comparative evaluation" by weighing "not only inferences urged
by the plaintiff . . . but also competing inferences rationally
drawn from the facts alleged."  *Tellabs*, 551 U.S. at 314.
Nevertheless, "[w]here there are equally strong inferences for
and against scienter," the rule is that "the draw [be awarded] to
the plaintiff."  *Biogen IDEC*, 537 F.3d at 45 (quoting *ACA Fin.*,
512 F.3d at 59).

   2.   Plaintiffs' Allegations of Misleading Statements

The complaint identifies several material misrepresentations
or omissions that were allegedly made by Defendants during the

Class Period.[9]  (Am. Compl. ¶¶ 70-91.)  Plaintiffs' theory is
that these misrepresentations or omissions were misleading
because the Company failed to disclose the internal audit related
to unlawful sales practices, the resulting terminations of
several CRM sales personnel, as well as the potential impact
these terminations would have on CRM revenues.  Defendants
counter that they had no duty to disclose the information and
that the alleged misstatements were not, in any event,
misleading.

     To satisfy the first element of a Section 10(b) claim, a
plaintiff must demonstrate that "a defendant made a statement
that was '*misleading* as to a *material* fact.'"  *Matrixx*
*Initiatives, Inc. v. Siracusano*, --- U.S. ----, 131 S. Ct. 1309,
1318 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238
(1988)).  The misrepresentations or omitted facts alleged in the
complaint will be considered material, insofar as "there is a
substantial likelihood that a reasonable investor would have

---

     [9]  The complaint also alleges statements made *after* the
Class Period, allegedly "correct[ing] previous[] false and
misleading statements."  (Am. Compl. ¶¶ 92-100.)  Plaintiffs do
not discuss these statements in their Opposition to Defendants'
motion to dismiss.  Nor do I view such statements as actionable.
*See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 n.31 (1st
Cir. 1996) ("We limit our analysis of the . . . plaintiffs'
claims of affirmative misrepresentation to the statements
allegedly made by defendants within the Class Period") *superseded*
*on other grounds by statute as recognized in Greebel v. FTP*
*Software, Inc.*, 194 F.3d 185, 197 (1st Cir. 1999).  That said,
these *ex post* allegations may provide insight regarding allegedly
actionable statements made during the Class Period.

viewed it as significantly alter[ing] the total mix of information made available." *Waters Corp.*, 632 F.3d at 756 (quoting *Basic*, 485 U.S. at 231-32) (internal quotation marks omitted and alteration in original).

Even where "information is material, there is no liability under Rule 10b-5 unless there was a duty to disclose it." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987); *see also Chiarella v. United States*, 445 U.S. 222, 235 (1980) (observing that a duty to disclose "does not arise from the mere possession of nonpublic [even material] market information."). The existence of such a duty depends on "whether the securities law imposes on defendants a 'specific obligation' to disclose information of the type that plaintiffs claim was omitted." *Gozani*, 638 F.3d at 57 (quoting *Cooperman v. Individual, Corp.* 171 F.3d 43, 49-50 (1st Cir. 1999)). In this connection, Rule 10b-5 requires, when a company speaks, *only* the disclosure of facts that would be "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. In other words, "a voluntary disclosure of information that a reasonable investor would consider material must be complete and accurate." *Gozani*, 638 F.3d at 57 (quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990)).

Accordingly, Plaintiffs' contention that the Company had a duty to disclose the unlawful practices and their consequences depends on whether the alleged misrepresentations or omissions were in fact incomplete or inaccurate, or otherwise misleading. Plaintiffs point to five series of statements, which they claim are actionable on the basis of Section 10(b). In accordance with the practice in this circuit, I will analyze allegedly fraudulent statements separately, grouping similar statements for meaningful analysis. *See Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 38 (D. Mass. 2009).

a. *Plaintiffs' Alleged Misstatements or Omissions Prior to, or at the Time of, the Terminations*

Plaintiffs cite four series of statements allegedly made either prior to, or approximately at the time of the terminations:

1. The statements made during the October 20, 2009 conference call suggesting that newly-hired sales personnel would cause the Company "to fall short of [the Company's] original expectations in the last half of [2009]," or would create a "positive but mixed" outlook for market growth expectations. (Am. Compl. ¶¶ 75, 76.)

2. The statements contained in the November 6, 2009 Form 10-Q that Defendants were "currently working with the government to understand the scope of the [DHHS Subpoena]" received on September 25, 2009 and that "additional sales representatives w[ould] generate incremental net sales in future periods." (*Id.* ¶¶ 81, 83.)

3. The statement made during the December 1, 2009 Piper Jaffray Healthcare Conference Call suggesting

21

that Defendant Elliott had not encountered "many surprises" when he became CEO.  (*Id.* ¶ 84.)

4.   The Company's listing, in the December 10 Prospectus and the December 14 Supplement, its "ability to retain key members of [its] CRM sales force and other key personnel," as one of fifty one risk factors that could cause its actual results to differ materially from forward-looking statements. (*Id.* ¶ 87.)

None of these four statements constitutes an actionable misrepresentation.  The theory advanced by Plaintiffs that, during the October 20, 2009 conference call, Defendants' mere reference to the *hiring* of CRM sales personnel gave rise to a duty to disclose questionable activities recently discovered by the Company and any *potential firings* is unavailing.  At the time the statements were made, the internal audit was still ongoing. The terminations occurred approximately two months later in mid-December.  The complaint thus falls short of showing that Defendants knew *at the time* of the statements (October 2009) that the audit would lead to the terminations of several CRM sales representatives, let alone that this process would have an "inevitable" impact on the its CRM revenues.  *ACA Fin.*, 512 F.3d at 62 (noting that statements were not materially misleading where there was "nothing . . . to establish that the defendants were aware of facts, at the time they made their predictions, that would have made those predictions unreasonable").

The suggestion that the Company continued to assure that sales productivity would grow as of November 6, 2009 is also

insufficient to constitute an actionable misrepresentation.  The
Company was entitled to conduct its investigation internally and
determine within a reasonable time whether any violations had
been committed.  *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d
753, 761 (7th Cir. 2007) ("Managers cannot tell lies but are
entitled to investigate for a reasonable time, until they have a
full story to reveal.").  Otherwise, the Company may have been
exposed to liability for precipitous disclosure.  *See Biogen
IDEC*, 537 F.3d at 58 ("The company would have behaved
irresponsibly (and possibly in violation of the securities laws)
if it had made a public announcement which was possibly
inaccurate because the [questionable practices] had not yet been
adequately investigated.").

Equally unpersuasive is Plaintiffs' theory that Defendants
engaged in cognizable misrepresentations by "minimizing" the
importance of the DHHS Subpoena, despite their knowledge of the
Company's pending investigation and firings.  The November 6
statements contained in the Form 10-Q cannot serve as a basis for
a misrepresentation claim.  The complaint does not explain how
the Company's admission that it was currently working with the
government to understand the scope of the DHHS Subpoena was
misleading.  In fact, the subpoena related "to contributions made
by CRM to charities with ties to physicians or their families,"
whereas the pending internal audit concerned the expenses

incurred for food and entertainment provided to physicians during trips to certain of Boston Scientific's manufacturing facilities. Plaintiffs thus fail to establish a sufficient nexus between these two events. *Cf. Backman*, 910 F.2d at 16 (noting that the duty to make "complete and accurate" disclosures "does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead.") (internal quotations marks and citation omitted).

Next, Plaintiffs contend that Defendant Elliot's statement that he did not encounter "many surprises" when he became CEO was misleading. This theory is untenable. The sole basis for Plaintiffs' contention is that this statement was made "in the context of a discussion of the CRM Group," which experienced, a little more than a week after, the termination of ten CRM sales representatives. This chronology does not suffice to support an actionable misrepresentation. Again, Plaintiffs fail to show a nexus between the statement made by Defendant Elliott on December 1, 2009 and the ongoing investigation which resulted in the termination of certain CRM sales personnel some ten days later. The mere "context of a discussion of the CRM Group" is insufficient to support a cognizable claim. This statement is too vague and indefinite to constitute an actionable

24

misrepresentation.  *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996) (noting that "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker" are non actionable misstatements) *superseded on other grounds by statute as recognized in Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir. 1999).

Finally, Plaintiffs argue that the Company's statements made in connection with the public offering were misleading.  I disagree.  Plaintiff correctly notes that a company is required not to make misrepresentations in securities registration statements.  *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 810 (7th Cir. 2001) ("A registration statement and prospectus for a new issue of securities must be accurate.").  The Company's statements made in the December 10 Prospectus and the December 14 Supplement do not, however, constitute an inaccurate representation.  The complaint alleges that the terminations occurred from December 9 to December 12, 2009.  Although the Company may be said to have known about the terminations at the time, but yet failed to disclose them expressly, the Company nevertheless cautioned investors in the Registration Statement that its results could be impacted by its "ability to retain key members of [its] CRM sales force and other key personnel."  The fact that the Company decided not to go into greater details,

25

when it had terminated only ten out of more than 1,100 sales
personnel shortly before the filing of the December 14
Supplement, is not sufficient to make these statements inaccurate
or incomplete.  Again, the complaint does not state with
particularity that Defendants knew, at the time the disclosures
were made, in any greater detail what *consequences* would result
from these terminations.  *See Biogen IDEC*, 537 F.3d at 45 ("A
statement cannot be intentionally misleading if the defendant did
not have sufficient information at the relevant time to form an
evaluation that there was a need to disclose certain information
and to form an intent not to disclose it."); *see also
Higginbotham*, 495 F.3d at 760-61 ("Prudent managers conduct
inquiries rather than jump the gun with half-formed stories as
soon as a problem comes to their attention.").  Even assuming
"that the plaintiff's complaint is that the precise degree of
risk was not stated, that failure is not sufficient to have
rendered the statements misleading." *Gozani*, 638 F.3d at 60.

> b.   *Plaintiffs' Alleged Misstatements or Omissions Post-
>      Terminations*

The last in the series of statements relied upon by
Plaintiffs were made by Defendant Elliott during a January 12,
2010 JP Morgan Healthcare Conference.  (Am. Compl. ¶ 90.)  During
that conference, Defendant Elliott discussed the Company's
overall performance, emphasizing that it had done "very, very
well at taking share" and that the sales force was "stable,

large, experienced" and "very successful."  (*Id.*)  Defendant
Elliott also mentioned that the Company had "done a ton of work
in the last six months to get rid of unnecessary distractions and
litigation." (*Id.*)

Plaintiffs' contention that these statements are actionable
misrepresentations, on the ground that Defendant Elliott failed
to disclose the terminations of the CRM sales representatives in
December and the rehiring of certain of them by St. Jude Medical
in early January, presents a somewhat closer call than the other
allegations.  Nevertheless, I find the statements that the
Company's sales force was "stable, large, experienced" and "very
successful" to fall on their face within the penumbra of non
actionable "puffing."  "The corporate puffery rule applies to
loose optimism about both a company's current state of affairs
and its future prospects." *Fitzer v. Sec. Dynamics Techs.*, 119
F. Supp. 2d 12, 23 (D. Mass. 2000).  Because "the recent trend is
to consider expressions of corporate optimism carefully" however,
claims of puffery now require a court to consider (1) "whether
the statement is so vague, so general, or so loosely optimistic
that a reasonable investor would find it unimportant to the total
mix of information" and (2) "whether the statement was also
considered unimportant to the total mix of information by the
market as a whole." *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp.

2d 239, 250 (D. Mass. 2006) (quoting *In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 20 (D. Mass. 1999)).

Applying this test, it is plain that Elliot's statements - that Boston Scientific's sales force was "stable, large, experienced" and "very successful" - constitute nonactionable corporate puffery.  *See Fitzer*, 119 F. Supp. 2d at 23 (finding a statement that a company was "well-positioned" to constitute nonactionable puffery).  Moreover, the complaint does not support an inference that Elliot's statements would have been viewed as "important" to the total mix of information.  At that conference, Defendant Elliott discussed the overall performance and prospects of the Company.  The statements relied upon by Plaintiffs were extremely broad and applied not only to the CRM sales force but rather to the Company's entire sales personnel.  Boston Scientific's sales force was arguably "stable" at that time.  As the Company stated in May 2010, the "terminations of 10 sales personnel represented less than one percent of [the Company's] U.S. CRM sales force" and had, in any event, "an immaterial impact on [its] net sales during the fourth quarter of 2009." (Defs.' App. Ex. 7, at 3.)  For the same reason, the complaint does not support an inference that the market would have considered Elliot's statement that day anything more than "unimportant to the total mix of information." *Brumbaugh*, 416 F. Supp. 2d at 250.

Those circumstances alone do not win the day for Defendants, however.   The issue becomes whether Defendants nevertheless had, at the time, a duty to caution against the "risk" resulting from the terminations.   As the First Circuit held in *Gozani*:

> In cases where the risk approaches a certainty, courts have no difficulty in finding a duty of disclosure. But where the level of risk is unknown and the existence of a risk is disclosed, we shall hesitate to conclude that disclosure is misleading merely because it did not state that the risk was "serious."

639 F.3d at 60.   Plaintiffs correctly note that, at the time the statements were made, Defendant Elliott was aware that certain sales force personnel had been terminated.   The complaint also supports an inference that Defendant Elliott knew, at that time, that these terminations *may* have *some* impact on the Company's CRM revenues.   As Defendant Elliott later observed, when CRM sales personnel are terminated, the expectation is that some will "take business with them."   (Am. Compl. ¶ 97.)   Although Elliot's statements may be insufficient to show that Defendants were engaged in fraudulent practices designed to give the false impression that the Company's prospects were higher than they actually were, *cf. In re Cabletron Sys., Inc.*, 311 F.3d 11, 23-23 (1st Cir. 2002) (finding allegations of a company's "unremittingly optimistic" statements in the face of adverse factors, coupled with the company's efforts to "hide the downward spiral," to be sufficient to state a claim), these statements nevertheless suggest that the "total mix of information"

29

available to investors may have been somewhat "skewed" by the lack of disclosure of the terminations of certain CRM sales representatives, *see Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009) (noting that allegations of a company touting the benefit of an unlawful program, while omitting serious inherent risks which would prove to be "disastrous," were actionable).

Defendants contend that *Greenstone v. Cambex Corp.*, 777 F. Supp. 88, 91 (D. Mass. 1991) ("*Greenstone I*"), *aff'd* 975 F.2d 22 (1st Cir. 1992) ("*Greenstone II*") stands for the proposition that they had no duty to disclose internal audit and disciplinary actions.  I disagree.  In *Greenstone*, the plaintiff alleged that the defendants had misrepresented in press releases and filings the financial status of Cambex because they had failed to disclose the fact that Cambex and the other defendants had engaged in unlawful practices, i.e., the sale of 'memory' components converted by the defendants, which later led to the filing of a lawsuit against Cambex.  *Greenstone I*, 777 F. Supp. at 89.  In essence, the plaintiff argued that the reports made by Cambex to the SEC prior to the filing of the lawsuit would have been "more accurate and complete if the defendants had revealed their improper activities because such activities allegedly influenced the financial success of Cambex."  *Id.* at 91.  The District Court found that "[b]eyond such vague references to the

30

'false portrayal' of revenues, the plaintiff does not state how records and statements made by Cambex were false and inaccurate." *Id.* It concluded that, because "the defendants had no duty to disclose information about their illegal business practices, they cannot be liable under Rule 10b-5." *Id.* On appeal, the First Circuit affirmed the district court's dismissal, but on somewhat different grounds. Chief Judge Breyer's analysis focused on whether the complaint had set "forth specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading," i.e., whether defendant knew at the time it made the alleged statements that a lawsuit resulting from the alleged unlawful practices was probable, yet chose not to disclose it. *Greenstone II*, 975 F.2d at 25. The court ultimately concluded that the complaint lacked specific allegations "that set forth a basis for the conclusion that Cambex and its officers knew of a significant possibility of loss flowing from [the unlawful practices] prior to the filing of the subsequent lawsuit." *Id.* at 28. Here, by contrast, the complaint establishes that the terminations of several CRM sales representatives had occurred approximately one month before Elliot's statements were made. These terminations were therefore no longer hypothetical but had already materialized.

For the same reasons, Defendants' reliance on *In re FoxHollow Technologies v. Securities Litigation*, No. 06-4595,

31

2008 WL 2220600 (N.D. Cal. May 27, 2008) is unpersuasive.  In
*FoxHollow*, the plaintiffs alleged that the defendant, the founder
of FoxHollow, had attempted to persuade FoxHollow's executives to
acquire a privately-held company started by defendant.  *Id.* at
*1-5.  They further claimed that, when FoxHollow's executives
refused to satisfy defendant's request, the defendant forced
three of them to resign, or otherwise caused them to be
terminated, in turn causing the company's stock to drop at the
time those departures were publicly disclosed.  *Id.* at *6-11.
The thrust of the plaintiffs' case in *FoxHollow* rested on the
allegation that the company should have disclosed the internal
management disagreement *prior* to the actual departures of the
officers.  *Id.*  The district court held that the statements
"acknowledging the efforts of FoxHollow's employees, and
emphasizing that 'people' were an important piece of FoxHollow's
infrastructure," were not misleading.  *Id.* at 23.  The rationale
was, the Court found, that the "defendants did not have a duty to
disclose the hypothetical possibility that some of the senior
executives might at some point be leaving the Company, *before*
such an event occurred."  *Id.*  In this case, by contrast,
Elliot's statements were made approximately one month *after* the
terminations occurred.

Accepting all alleged facts as true and drawing all
inferences in favor of Plaintiffs, a reasonable person could

32

infer that Defendant Elliot's statements during the JP Morgan

Healthcare Conference were misleading, because incomplete, on the

ground that Defendant Elliot failed to disclose the terminations

of certain CRM sales representatives.[10]

### 3.   Plaintiffs' Allegations of Scienter

Even if Plaintiffs have sufficiently alleged a material

misrepresentation or omission - as I found they do with respect

to the risks related to the terminations - they must still allege

---

[10]   That said, I find Plaintiffs' reliance on *Matrixx Initiatives, Inc. v. Siracusano*, --- U.S. ----, 131 S. Ct. 1309 (2011) to show the misleading character of Defendants' statements to be misplaced.  The facts in *Matrixx* are distinguishable.  In *Matrixx,* the plaintiffs in a securities fraud class action alleged that defendants had failed to disclose reports establishing a possible link between Matrixx's leading product, Zicam Cold Remedy, and loss of smell (anosmia), rendering the statements made by Matrixx misleading.  *Id.* at 1314-16.  The district court dismissed the action on the ground that plaintiffs had not alleged a "statistically significant correlation between the use of Zicam and anosmia so as to make failure to public[ly] disclose complaints and [research] study a material omission." *Id.* at 1317 (alteration in original).  After the Ninth Circuit reversed, the Supreme Court granted certiorari and affirmed.  The Supreme Court held that, despite the lack of statistical evidence, the plaintiffs had adequately pleaded materiality.  *Id.* at 1323.  The allegations contained in the complaint were sufficient, the Court found, to show a significant risk to the commercial viability of Matrixx's product, and that this risk could have been viewed by a reasonable investor "as having *significantly* altered the 'total mix' of information made available."  *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  Importantly, Matrixx had publicly dismissed reports linking the key ingredient of Zicam to loss of smell, when it had received scientific evidence suggesting the existence of such link.  *Id.*  By contrast to the allegations in *Matrixx*, Defendants here are not alleged to have publicly denied the investigation and subsequent terminations of certain of its CRM sales personnel.

facts giving rise to a "strong inference" of scienter.
Plaintiffs advance three theories to show a strong inference of
scienter; all fail as a matter of law.

>    a.   *The Role and Responsibilities of Individual Defendants*
>         *and the Importance of the CRM Group for the Company's*
>         *Overall Performance*

Plaintiffs' first theory is that, given the importance of
the CRM group and the positions of the individual defendants,
they were aware of the terminations and their potential impact on
the CRM sales, yet failed to disclose the information during the
Class Period.  Consistent with this theory, the complaint alleges
that the CRM group was central to the Company's revenues,
contributing approximately 30 percent of net sales for the third
quarters of 2008 and 2009.  (Am. Compl. ¶ 102.)  This suggests
that any decrease in the CRM sales would have a significant
impact on the Company's overall performance.  The complaint also
alleges that the individual defendants were all executives of the
Company, who actively managed the Company's CRM group.  (*Id*. ¶¶
103-07.)  Plaintiffs rely on Elliot's statements that he would
"focus" on CRM sales when he became CEO and that he had access to
a computer system that enabled him to view CRM sales
representatives's sales, products, and margins on a real-time
basis.  (*Id*. ¶¶ 103, 119-20.)

The responsibilities of the individual defendants, even
combined with the importance of the CRM group, are insufficient

34

to support a strong inference of scienter.  That CRM sales
constituted approximately 30 percent of the Company's overall
sales does not demonstrate that Defendants knew or were reckless
in not knowing the impact of the disciplinary actions.
Regardless of the importance of the CRM group, Defendants were
required, when considering the significance of events that may
impact sales, to evaluate "the anticipated magnitude of the event
in light of the totality of the company activity." *Waters Corp.*,
632 F.3d at 759 (quoting *City of Philadelphia v. Fleming Cos.*,
264 F.3d 1245, 1265 (10th Cir. 2001)).  Likewise, a strong
inference of scienter cannot be drawn from the fact that
Defendant Elliott had access, and recognized the value of using,
the online computer system for tracking the performance of CRM
sales representatives.  Defendants correctly state that "there is
a big difference between knowing about [financial reports] and
knowing that the reports are false." *Higginbotham*, 495 F.3d 758.
Moreover, "[k]nowingly omitting material information is
probative, although not determinative, of scienter." *Biogen
IDEC*, 537 F.3d at 47 (citation omitted).  In other words, a
"company does not commit securities fraud merely by failing to
disclose all non-public material information that it possesses."
*Boston Scientific,* --- F.3d ----, 2011 WL 3558203, at *20.

Nor can a strong inference of scienter be drawn solely from
the allegation that Defendants knew of the terminations.

Instead, the issue is whether Defendants, Elliott in this instance, were aware of a future material *impact* of the terminations as of January 12, 2010.  *See id.* (noting that "the key issue [in the context of scienter] is not whether defendants were aware that the [fix] was being contemplated, as plaintiff suggests, but rather whether they were aware or recklessly unaware that [a product defect] threatened [the product]'s viability and hence the price of [the Company]'s stock.").  On this point, the complaint fails.[11]  At most, the complaint shows that Nock had begun to work at St. Jude Medical one week before, on January 4, 2010.  But the likelihood that a material number of sales accounts would disappear had not become manifest *at that time*.  *See Biogen IDEC*, 537 F.3d at 48 ("defendants cannot have committed fraud if they did not know *at the time* that the failure to provide additional information was misleading.").

_____

[11]  Plaintiffs also contend that the testimony of the confidential witnesses further bolsters the inference of scienter, because they confirm Defendants' level of knowledge of the terminations and their impact on the Company's revenues.  I disagree.  The relevant allegations made by the confidential witnesses merely suggest that the internal audit began in August 2009, that twenty-one CRM sales personnel were interrogated between the end of August and the beginning of September and that CRM sales personnel were terminated in December.  (Am. Compl. ¶¶ 111-13.)  These allegations do not add any more "meat . . . on the bones of the complaint" to support a strong inference of scienter.  *Hill v. Gozani*, 638 F.3d 40, 56 (1st Cir. 2011) (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 63 (1st Cir. 2008)) (internal quotations marks omitted).

b.   *The Repeated Ethical violations and "Red Flags" to the Terminations of CRM Sales Personnel and Subsequent Loss*

Plaintiffs contend that certain "red flags" strongly suggest that Defendants knew that the CRM terminations were "inevitable" and would have a significant impact on the Company's overall performance.

None of the "red flags" alleged by Plaintiffs - i.e., the August 2009 internal audit, the imposition of the AdvaMed Code of Ethics, the interview of twenty-one CRM sales personnel in September 2009, and the resulting terminations - are sufficient to support an inference of scienter on the part of Defendants. At most, the complaint suggests that the Company began an internal audit in August 2009, only one month after the AdvaMed Code of Ethics became effective, to review the expense reports of CRM sales representatives.  This does not show corporate negligence, but rather suggests corporate responsibility.  As to the terminations, the complaint again fails to show that Defendant Elliott was aware of the consequences that such terminations would have on CRM revenues *at the time* the statements were made.  Certainly, the fact that Defendants certified compliance with the California Comprehensive Compliance Program in July 2010, approximately five months *after* the end of the Class Period, does not support an inference, let alone a strong inference, of scienter.

    *c.    The Company's Motive to Commit Fraud*

    Plaintiffs' last theory is that Defendants' motive to commit fraud is evidenced by their "hopes" that newly-hired CRM sales representatives would "offset" the inevitable loss sustained from the terminations of CRM key sales personnel, or otherwise that the $2 billion public offering would go forward.

    Again, Plaintiffs' theory fails to state a strong inference of scienter.  Defendants correctly contend that the existence of a public offering during the period of alleged misrepresentations cannot itself lead to an inference of scienter.  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 215 (S.D.N.Y. 2008) (rejecting scienter allegation based on claim that defendant "needed to conceal negative information about [a drug] in order to complete a $ 1.15 billion senior notes offering used to fund development of [such a drug]").  The complaint contains no allegations supporting an inference that Defendants obtained any benefits from the offering.  *See ACA Fin.*, 512 F.3d at 67 (finding no scienter because, among other things, "[t]here are no allegations that the proceeds from the . . . bonds would be spent on anything that would personally enrich any of the . . . defendants.");  *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (finding no inference of scienter where defendants were not alleged to have "secure[d] personal gain" from a $100 million public offering, nor was the implication that inflating the stock

38

price would increase the defendants' personal compensation sufficient to show motive to commit fraud).  Importantly, no allegation of insider trading on the part of any of the individual defendants has been made in the complaint.  Moreover, the offering materials did identify the Company's "ability to retain key members of [its] CRM sales force and other key personnel," as a factor that could potentially affect its actual results.  The Company was therefore prudent, rather than reckless, in submitting these materials.

In sum, I am satisfied that "competing inferences" demonstrating no fraudulent scienter are more compelling than "plaintiffs' preferred interpretation of the facts."  *ACA Fin.*, 512 F.3d at 59.  Fairly read, the complaint portrays the Company as being diligent, rather than fraudulent or reckless, when it chose to conduct an internal audit, just one month after the AdvaMed Code of Ethics was put into place, and then decided to terminate sales personnel who repeatedly breached its healthcare professional Code of Conduct.  *See Slayton v. Am. Express. Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Rather than suggesting an intent to deceive investors, the facts contained in [the complaint] exhibit the defendants engaging in a good faith process to inform themselves and the public of the risks").  The Company knew the terminations of CRM sales representatives may have a cost, yet chose to move forward with the process.  The

disclosure by Defendants of the terminations and their potential impact on the Company's future revenues only *two months* after these terminations took place was "reasonable time," which was "necessary to get things right." *Higginbotham*, 495 F.3d at 761. The fact that Defendants could later concede that "it might well have been more prudent for them to disclose" the information earlier, does not establish scienter. *Waters Corp.*, 632 F.3d at 760. While "[i]t was not unreasonable for plaintiff[s] to have been suspicious of why that was not done, . . . mere suspicion is not enough" to support a strong inference of scienter. *Id.*

Accordingly, I find that the complaint does not adequately state a strong inference of scienter.[12] Absent scienter, Plaintiffs fail to state a cognizable claim for securities fraud under Section 10(b) and dismissal as to Count I is therefore warranted.

## B.   *Section 20(a) (Count II)*

In addition to their claim under Section 10(b) and Rule 10b-5, Plaintiffs contend that the individual defendants have engaged in wrongful conduct in violation of Section 20(a) of the

---

[12]   Certainly, the admission by Defendant Elliot on February 11, 2010 that they "got [to the fourth quarter earnings] ugly" does not support an inference of scienter either. (Def.'s App. Ex. 3, at 1739.)  Contrary to Plaintiffs' allegation, this statement does *not* refer to the terminations of the CRM employees, but rather to the Company's "gross margins which [had fallen] for the second straight quarter although a large majority of the drop [was] due to two non-recurring events, the CRM advisory and third party sourcing agreement." (*Id.*)

Securities Exchange Act.  (Am. Compl. ¶¶ 159-60.)  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls" another person liable under Section 10(b) "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  Because I have found that Plaintiffs have not adequately alleged an underlying Section 10(b) violation, their claim under Section 20(a) fails as a matter of law.  *Boston Scientific*, --- F.3d ----, 2011 WL 3558203, at *21.

### IV.  CONCLUSION

For the reasons set forth more fully above, I GRANT Defendants' motion to dismiss as to all Plaintiffs' claims. (Dkt. No. 48.)

/s/ *Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE